# Richmond

## VICTORIA ROUNTREE, TRADING AS ROUNTREE DAIRY V. STATE MILK COMMISSION.

January 14, 1946.

Record No. 2949.

Present, All the Justices.

The opinion states the case.

*Thomas L. Woodward,* for the appellant.

*Abram P. Staples, Attorney General,* and *V. P. Randolph, Jr., Assistant Attorney General,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The parties to this controversy will be referred to by the names by which they are known and operate.

Victoria Rountree, trading as Rountree Dairy, filed application on May 21, 1943, for a license as a producer-distributor in the Suffolk, Virginia, area. The Greenfield Dairy filed an application for a distributor license on May 24, 1943, which was favorably acted upon and issued on May 28, 1943. As to the Rountree application this statement is made by the Commission in its opinion filed and made a part of the record: "The Commission delayed action pending an investigation of conditions on the Suffolk market."

This application was refused on June 17, 1943. On July 2, 1943, B. L. Rountree, representing the Rountree Dairy, asked the Commission to reconsider its action. The Commission, before acting thereon, directed its secretary, E. C. C. Woods, and a member of the Commission, Mr. Mark Turner, to go to Suffolk and make an investigation on July 9, 1943. The report of this investigation included this state-

ment: "The market was thoroughly covered and anyone who desired to buy milk could do so either retail or wholesale unless in case of any retail customer whose credit rating was not up to par."

It appears that an investigation was also had on May 27, 1943, and the Commission stated that after these investigations and the meetings with B. L. Rountree, personally, and again with his attorney, it declined to change its decision of June 17, 1943. The law controlling the Milk Commission is embraced in Sections 1211x, *et seq.*, of the Code of Virginia 1942 (Michie).

In *Reynolds* v. *Milk Comm.*, 163 Va. 957, 179 S. E. 507, in enumerating the powers of the Milk Commission, under the statute, this court said this: "To investigate all matters pertaining to the production, processing, storage, transportation, distribution and sale of milk in the state; to supervise, regulate and control the production, transportation, processing, storage, distribution, delivery and sale of milk for consumption in the state; to act as arbiter in disputes, between the producers and distributors; to examine into the business, books and accounts of any producer or distributor, to issue subpoenas to the producers and distributors and require them to produce their records. The Commission is empowered to make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of the act, * * * A license may be required of producers and distributors, and the Commission may grant or decline a license or revoke any already granted, after due notice and a hearing."

Section 1211bb contains this provision:

"(a) Any person or persons aggrieved by an order of the Commission refusing a license, to re-issue or revoke or suspend a license, to a distributor or producer-distributor, or to transfer a license from one person to another, and any other order of the Commission applying only to a person or persons, and, not otherwise specifically provided for, may be reviewed upon appeal to the Supreme Court of Appeals. Any person or persons aggrieved by an order of the Com-

mission fixing, revising or amending the price at or the terms upon which milk may be bought or sold, or by any other general action, rule or regulation or order of the Commission, may, within forty (40) days after the effective date of such action, rule, regulation or order, appeal therefrom to the Circuit Court of the city of Richmond."

Subsequent sub-sections of this statute provide for the steps to be taken in perfecting the appeal to the Circuit Court of the city of Richmond and the sub-section (f) concludes as follows:

"Upon the hearing, the court shall determine whether the order appealed is within the discretion vested in the Commission by law, and if so, whether the Commission has exercised a reasonable discretion or the order is unreasonable and capricious. If the Commission is found to be without authority of law to enter the order complained of, or that it was unreasonable and capricious, the court shall enter an order declaring the order of the Commission null and void. Where the appeal is from a finding of fact, the order of the Commission shall be given the weight of a jury on a fact found. If the court finds that the findings of fact are not sustained by the evidence, the court may either declare such finding of fact void or remand the cause to the Commission for future proceedings."

It will be observed that these statutory provisions relating to appeal apply in terms only to proceedings in the Circuit Court of the city of Richmond.

The Attorney General makes this statement in his brief filed for the Commission:

"It will be seen that no specific standards or rules are laid down upon an appeal to this court (The Supreme Court of Appeals); presumably they are to be governed by the same general rules for other appeals."

Why the statute makes this distinction between the course to be pursued in the case of one appeal and the other and states the effect of the Commission's findings of fact in the one case and is silent as to it in the other, is not necessary to enquire, as will presently be seen.

At this point it seems desirable to make a statement of the local conditions and happenings which antedate the incidents which we have detailed. Let us bear in mind that the license which was applied for and refused was upon the application of Victoria Rountree, not B. L. Rountree, her son, though he was active in the interest of his mother.

The Rountree farm, about three and one-half miles from the city of Suffolk, and lying along the Nansemond river, owned by Mrs. Rountree, contains about seven hundred acres. It has been and is in a high state of fertility. Three hundred acres are in cultivation and the same number of acres in pasture land, and about one hundred acres are woodland. A portion of the pasture is marsh land, which affords a succulent and desirable type of grazing, especially when uplands are impaired by the heat and droughts usual in summer. It supports some 225 head of milk stock, of which from 140 to 150 are cows, consisting mostly of pure bred Guernseys. As far back as 1935 and to 1942, the Rountree Dairy was operating in the Suffolk area as a producer-distributor under a license from the State Milk Commission. In 1942, it was invited to join the Nansemond Cooperative Dairy, Inc. It became a member of that organization, its equipment and its capacity adding material strength thereto. At that time B. L. Rountree was the active person in the Rountree Dairy enterprise and his was what might be termed the directing voice. Mrs. G. G. Coulbourn, who owned the Greenfield Dairy, was also a member of the organization, and her interests were cared for by her son, Edwin D. Coulbourn, a Suffolk lawyer.

Several local producers were also members of the cooperative organization. It was an industrial family, as it were, and as unhappily is frequently the case, with members of that social unit, known as the family, the homogeneity did not last through the vicissitudes of time. Two of the principal members, as we shall see, were later to become antagonists of more than usual virulence.

The war came on and with it the nascency of what became known as the OPA. This Federal agency fixed the

maximum ceiling price of milk and the Milk Commission fixed the minimum price for the area with which we are concerned. The Rountrees declared and demonstrated that the price fixed by the latter agency was materially under the cost of production, indeed, all of the members charged that the price was too low and as a matter of fact a number of local producers went out of business and sold their herds. The feeling was so acute that it found expression in an advertisement in the local afternoon paper. The Suffolk News-Herald, in its issue of May 1, 1943, featured these glaring headlines: "A Severe Milk Shortage Faces Suffolk. Within a week one-third of the city's milk supply will be forced to other markets." It notified the public that the largest dairy selling milk to the cooperative organization was diverting its entire output, 300 gallons, to another market; that the OPA had put a ceiling price on milk sold for processing at 38c per gallon, while the cost of producing it was 43c; that the weekly loss on 300 gallons production was $105.00; that the Norfolk area had a retail quart price of 18c while the Suffolk price was 17c; that this 1c differential is the difference between staying in business and going out of business. This advertisement was signed as follows: "Nansemond Cooperative Dairy, Inc. Greenfield Dairy, Earnest Oliver, Horace Oliver, Rountree Dairy, King Dairy."

It was in evidence that the advertisement was written by Mr. Missett, the general manager of the paper. It is true that his testimony tended to show that Mr. B. L. Rountree was quite active in its publishment and had said that he had determined to withdraw his milk from the area and sever his connections with the organization. But it is a fact that in the exploitation of the advertisement Rountree was joined by Mr. Hardy, who was its manager, and Mr. Coulbourn, who was an associate member. It was declared that the real purpose of the advertisement was to induce the OPA to relax its position as to the price fixed. Rountree is excoriated by its adversaries in the milk business and, indeed, by the Commission and its representatives for withdrawing, and it

would have been better, probably, if he had not done so. It can be said, however, with no small show of propriety that its action was in harmony with the accepted philosophy that self preservation is the first law of nature.

We do not pretend to know the influencing reasons but it seems anomalous that the Suffolk area was just between two contiguous areas in which the fixed prices were higher.

The withdrawal of its milk by Rountree and selling it in Hampton at a greater price is cited as an instance of a violation of the law in the fact that it became a party to an illegal purchase. In view of this position it is remarkable that the brief of the Commission closes with this statement: "The appellant can sell milk at wholesale to whomsoever it pleases and any claim of the petition to the contrary is not based on the facts or the record."

If the Rountree Dairy had not been meticulous to observe certain regulations and rules of the Commission the natural thought is that it should have been disciplined by the imposition of whatever penalty was incurred. As to violations of the law and rules and regulations we find the admission of Mr. Coulbourn that the Greenfield Dairy, which now controls the distributor situation in the area, sold milk under a false label so far as its grade was concerned. The evidence makes it plain that this was under quite innocent circumstances; that there was no intentional wrong doing. It just shows that any human agency may err, particularly in the face of the red tape of Commissions and government entities.

It will be noted that the Rountree Dairy withdrew from the Nansemond Cooperative on May 1, 1943, and began selling its milk to the Seldon Dairy in Hampton and to other dairies in that area. It was not until May 6, 1943, that a regulation adopted by the OPA became effective, prohibiting a producer in one area from receiving more for his milk in another area. This is shown by the following testimony of Mr. C. Henry Toler, an officer of the OPA:

"Q. Did you discuss with Mr. Rountree the possible withdrawal of his milk from the Suffolk market at any time?

"A. Yes, I did. After Mr. Rountree served notice on OPA, along with the State Milk Commission about that, I talked with Mr. Rountree about the withdrawal, requesting that he not withdraw his milk and warned him that the Office of Price Administration was at the time drawing regulations that would prohibit his receiving any more for his milk elsewhere than in Suffolk.

"Q. Was such a regulation passed by the OPA, do you know?

"A. Yes, sir.

"Q. When did it become effective?

"A. May 6, 1943."

Rountree was not notified of this regulation until later and then through a letter of the State Price Officer, R. B. Pinchbeck, dated May 8, 1943, a copy of which was sent to him. This is noted for two purposes:

First, to emphasize the fact that at the time of the withdrawal and the formed design to sell in another market at a higher price, there was no regulation prohibiting it.

Second, that the OPA and the Milk Commission were notified and advised of it, so that there was nothing secretive or surreptitious about it. Rountree's reasons for withdrawing were well known to both of these agencies and the OPA was, to an extent, in sympathy with them for Mr. Toler again testified on this point, the Chairman of the Milk Commission being the interrogator:

"Q. He was urged by the OPA not to withdraw his milk from this market because of the bad effect that might result to the consumers of the market?

"A. Yes, sir, and naturally we were interested in seeing that the consumer is supplied and does not pay more than the ceiling price, a fair price for it, and we did urge him on that trip to keep his milk in Suffolk until we could get some ruling out of our regional office on whether a price increase could be made effective or not, and get that decision on it, as well as urging him to do so for the welfare of the Suffolk citizens."

This is also corroborative of B. L. Rountree's testimony that the effort to have the ceiling price increased was general.

We have perhaps spent too much time and space in elaborating what are really non-essentials.

As we see it, the real question to be determined was whether or not there was, as of the 21st of May, 1943, an adequate supply of pure wholesome milk for distribution in the Suffolk area.

To be sure, many witnesses introduced by the Commission at the hearings testified in the affirmative. They said that the supply as to quantity and quality was ample. But it is equally true that there was a volume of testimony consisting of a large number of witnesses representing nearly every walk of life, including housewives, small merchants, restaurant owners, mothers with large families, and other individuals who testified that they had not been supplied for a long period with an adequate quantity of pure and wholesome milk; that they had to do without it or procure canned milk. Two physicians made statements that the supply was inadequate.

More than a hundred citizens of Suffolk petitioned the Milk Commission of Virginia as of May, 1944, asserting that the sale and distribution of quality milk on the Suffolk market was inadequate and had been for the past year, and that they believed it to be to the best interest of the community that the milk of the Rountree Dairy be sold direct on the local market and not through any other distributor.

It is of very real moment that this imposing list of citizens of Suffolk includes the Commonwealth's Attorney for Nansemond county, the Clerk of Nansemond County Circuit Court and the cashier of the National Bank of Suffolk. Certainly that class of persons is uninfluenced save by what they believe to be existing facts.

We shall not stop to emphasize the testimony that the milk supplied to the area was carelessly handled resulting in dirty bottles and an occasional fly and sometimes sour and

curdled milk, for those things will happen however careful the handlers may be.

It is of convincing strength that those persons who cannot get milk—who are not supplied—who need it but are powerless to get it—are in a better position to know whether or not there is a shortage.

Suffolk and its environs constitute an area of some 20,000 people. In the brief of the appellant it is stated that the normal supply of milk necessary for the Suffolk area is estimated at from 1500 to 2200 gallons of milk per day. This is not controverted and seems a reasonable estimate.

There are, and have been since the first part of 1943, three distributors supplying the area. They are the White Marsh Dairy, distributing 25 to 30 gallons per day, principally to soda fountains; the Bay Point Dairy, owned by Mr. A. Obici, with whom the distribution of milk is a hobby, distributing about 70 gallons per day to a select line of custom, and the Nansemond Cooperative Dairy, until it became the Greenfield Dairy, distributing about 550 gallons per day.

The two small dairies were producers as well. The Nansemond Cooperative and its successor, the Greenfield Dairy, only a distributor. It thus appears that there has never been an adequate supply produced in the area, necessitating, therefore, implementation from the outside. The fact that the Greenfield Dairy secures a large portion of its milk from remote parts of the state and from other states, as far away as Indiana, shows beyond cavil the inadequacy of the supply.

It is axiomatic that there must be supply in order to have distribution. An imposing number of witnesses testified that they could not get milk in the market; that the stores did not have it; that it was not delivered on the streets from house to house; grocerymen testified that they could not buy it; individuals testified that the milk trucks passed their houses, and, in some cases, when hailed the response was that there was no milk.

With this situation existing it is remarkable, to say the least, that a producer in the area with the plant, equipment,

and facilities of the Rountree is denied the right to sell and distribute its product, wholesome and fresh as it is conceded to be, direct to a necessitous people, waiting, looking and longing for it. It just does not seem reasonable.

The effect of the ruling of the Commission is to give to one distributor the exclusive right of satisfying the milk needs and requirements of some 20,000 people, which savors strongly of a monopoly, and there is certainly sufficient credible evidence that the requirements and needs of the consuming public are not met.

The Commission takes the position that this court is bound by its findings of fact, as though it were a jury's verdict. That is certainly true in the case of an appeal to the Circuit Court of the city of Richmond. The terms of the statute make it so. If it be true in the case of an appeal to this court it is qualified by the conditions that the evidence must sustain the decision which, in turn, must not be arbitrary or capricious. Any presumption of the correctness of the findings is much weakened when the arbiter, as in this case, is a party to the controversy. It would be less than human if it were not interested in upholding its own action.

The Commission introduced a number of witnesses in its own behalf and examined them itself, though its own able attorney was present, and the weight of its effect was to emphasize its point that Rountree had created the shortage by withdrawing from the cooperative organization. He stoutly maintained that there was no alternative since the Coulbourns had bought out the other members.

Mr. Birdsong, City Attorney of Suffolk, was introduced as a witness by the Commission and he testified in part as follows:

" * * * Then Mr. Rountree—We talked the situation over and told him what a jam the situation was and told him that Dr. Pinchbeck said that there was nothing he could do towards raising the price of milk, that he had no authority to, and it would take some time to negotiate a deal through Washington in which the price of milk could be raised, if it could be, but that he was willing to hear our side and do

what he thought was right in reference to the raising of the price of milk and, with that suggestion, we asked Mr. Rountree if he wouldn't come back to the market pending this investigation by OPA. My recollection is he said he would come back for at least two months to give us an opportunity to work out the price increase with OPA. That is my recollection of it and I think that conference took place in my office."

This goes far to relieve the Rountrees of the sinister attitude with which they are charged. What they did was open and above board, which they undertook to justify by urging the necessity of the case.

On account of the wide range of the testimony it seemed fit to deal somewhat with the personal equation, perhaps too much so.

The over-all interest to be conserved is that of the public and we cannot escape the conclusion that this desired consummation will be best attained by the issuance of a producer-distributor license to the appellant to operate in the Suffolk area. We do not undertake to impugn for a moment the motives of the Commission, or those of anyone connected therewith. Too much feeling has been interjected due largely, we suspect, to intemperate zeal.

We think the ruling of the Commission is erroneous. Its decision is not sustained by the evidence. It is reversed and the case is remanded with the direction that a producer-distributor license to operate in the Suffolk area be issued to the appellant in accordance with the statutory requirements.

*Reversed and remanded.*

HOLT, J., concurring.

I am in complete accord with the conclusions which our court has reached, and for these reasons:

The record in this case takes up 336 pages of printed matter, together with voluminous exhibits. With brushwood cut away, its annals are short and simple: Should

Victoria Rountree be given the right to sell her dairy products by wholesale generally or at retail in Suffolk?

What she did was this: She asked the State Milk Commission for license to sell this product as a producer-distributor. The Commission's answer was "No." On June 17, 1943, it entered this order:

"After giving careful consideration to the foregoing facts, it is the opinion of the State Milk Commission that the application of Rountree Dairy for a license to become a distributor in the Suffolk Market be rejected, and that the Rountree Dairy should become a wholesale producer delivering its milk to the Greenfield Dairy and a base be fixed in accordance with the rules and regulations applying to that market."

That order, on rehearing, it reaffirmed on August 18, 1944. It further said:

"Upon application of the Rountree Dairy, a producer's license will be granted, a base established for that Dairy and assigned to a distributor in the Suffolk Market."

Regulation No. 8, promulgated by the Commission on February 1, 1944, declares in part:

"4. No producer's license shall be granted an applicant who on the date of the application is selling milk to any person, firm, corporation or association operating outside of the production area in which the applicant is producing milk, without the consent of the State Milk Commission.

"5. The sale by a distributor, a producer-distributor, or a producer to any one other than a distributor or producer-distributor operating exclusively within the sales area, without the consent of the State Milk Commission, shall constitute a ground for the revocation of the license of a distributor, producer-distributor or producer."

"No person, firm or corporation licensed under this regulation shall export milk out of a production area without the consent of the State Milk Commission."

From these orders it is plain that the Commission was willing to give to the Rountree Dairy a producer's license, provided it would sell its products to the Greenfield Dairy,

but was unwilling to give it a distributor's license to retail its own products in the town of Suffolk or to anybody else.

The reason assigned by the Commission for refusal to give to this petitioner the right to sell her dairy products by retail is that the market there was already amply and adequately supplied.

Now we are blandly told that this supply is adequate. One of the reasons which makes it adequate is that under power conferred on Greenfield by the Commission it is getting enough milk from the Rountree Dairy to make it so. However, the Greenfield Dairy is permitted to purchase and does purchase milk from adjoining areas where conditions are identical and milk from distant areas, as far away as Harrisonburg and indeed from distant states, at prices higher than the Rountree Dairy is permitted to charge.

Now it is said that Rountree Dairy can sell to any distributor outside the Suffolk area; this in the face of the order of June 17, 1943, which said that "the Rountree Dairy should become a wholesale producer, delivering its milk to the Greenfield Dairy and (at) a rate to be affixed according to the rules and regulations applying to that market," which ruling was in terms reaffirmed by the Commission on August 18, 1944, while on February 1, 1944, we see that if Rountree sells to one other than Greenfield that that "shall constitute a ground for revocation of the license of a distributor, producer-distributor or producer." And this in view of the fact that it once went into a court when Rountree was selling in the Hampton area outside the Suffolk area and obtained a "cease and desist" order, which order, so far as this record shows, is still in force.

There is an engaging simplicity about the suggestion that Rountree may now take milk to adjoining counties and there sell it at an advanced price to Greenfield or to anybody else who wants to buy it. Moreover, this is something new. One does not have to be even the son of a prophet to know what would have happened to Rountree had she before the institution of this suit undertaken to sell milk outside of the

Suffolk area. It is necessary only to remember what did happen when she did that in the Hampton area.

Appellant is the owner of a 700-acre farm within four miles of Suffolk and is the largest producer of dairy products in Nansemond county. That dairy is one of the oldest dairies there.

From these rulings of the Commission this situation now obtains:

The Rountree Dairy is forbidden—certainly before the institution of this suit—to sell its own dairy products by retail in Suffolk but is forced to sell it at wholesale to a competitor and rival that this competitor may sell it by retail in the forbidden area. But this is not all.

The Rountree Dairy, if permitted to do so, could sell its dairy products at wholesale to distributors in adjoining areas, Southampton county and Norfolk county, at a higher price than she now receives from the Greenfield Dairy, while Greenfield is actually paying to outside producers more than it is paying to Rountree.

As a matter of fact, the heavy weight of testimony is to the effect that retail delivery in the Suffolk area is inadequate. We find that the appellee has introduced the evidence of probably a dozen substantial witnesses, one of whom is a professor from Blacksburg, while over three hundred citizens of Suffolk have complained of a shortage in distribution. The testimony of one witness and a prominent citizen that he is getting enough milk has little value against that of another, possibly from a less exalted station, who says "that is not the case with me."

But one retailer, the Greenfield Dairy, is supplying the heavy weight of retail milk to Suffolk, while in Staunton— a town about the size of Suffolk—this retail business is divided among four or five producers.

In construing statutes and rules, we take into consideration not merely what has been done but what may be done. In this case the Commission may in every area limit retail distribution to one dealer and thus open the way to undesirable possibilities. In these days nobody loves monopolies.

In appellee's brief it is said that a letter written to the Commission by counsel for the appellant is of such a character that "if written to a court of law, the court would not only have been warranted, but, also would have been required, to commit the writer for contempt." Conceding for the sake of argument that it is somewhat contumacious, the misdeeds of counsel should not be visited upon his clients.

By indirection we are told that the Commission operates under OPA and must keep within the shadow of its wing. OPA has been charged with many sins, but we are not yet prepared to believe that it would fix the wholesale price of milk at one figure in Southampton county and at another in Nansemond county.

Most bureaus have as hall-marks two outstanding characteristics: Two things greater than all things are—immortality and power.

HUDGINS, J., dissenting.

The majority and the concurring opinions declare that the State Milk Commission arbitrarily denied Victoria Rountree, trading as Rountree Dairy, a license as distributor of milk in the Suffolk area. The evidence tending to support the issues of fact was in sharp conflict. The majority opinions state as facts only the evidence tending to support appellant's contention. There is ample evidence to support the action of the Milk Commission and its statement of fact, which is as follows:

"There are at present one distributor, Greenfield Dairy; and two producer-distributors, R. R. Howell and A. Obici, Bay Point Farm Dairy. The records indicate that Rountree Dairy held a license as a producer-distributor in the Suffolk Market from April 27, 1939, through June 30, 1942. During which period of time the records of the Milk Commission's office show a number of violations of the Milk Commission's Rules and Regulations applying to the distribution of milk in that market. On July 1, 1942, the Rountree Dairy became a wholesale producer with a base at the Nansemond Coopera-

tive Dairy, relinquishing their license as a distributor in that market. On May 1, 1943, Rountree Dairy withdrew its milk from the Nansemond Cooperative Dairy and the Suffolk Market without formal notice to the State Milk Commission or approval of the Commission. The withdrawal of this milk from the market by the Rountree Dairy created a shortage in the market to such an extent that it was impossible for the Nansemond Cooperative Dairy to continue home delivery for the consumers in this market. Since the withdrawal of this milk from the market by the applicant, it has been necessary to re-organize the distribution of milk in the Suffolk Market and to secure additional milk from other sources in the amount of 1600 gallons weekly to supply this market. It has been further shown that the present licensee in the Suffolk Market, the Greenfield Dairy, has offered to purchase the milk produced by the Rountree Dairy and to recommend to the Commission that a base be set up in that market for the entire production of that Dairy.

"It further appears to the Commission that the granting of a distributor's license to the Rountree Dairy would cause a further duplication of delivery and the overlapping of routes which would be an additional cost of serving that market with milk. Such duplications and overlapping of routes would be in direct conflict with the Orders and Regulations of the Office of Defense Transportation and the Office of Price Administration in the use of automotive equipment, gasoline and tires."

In *Reynolds* v. *Milk Comm.*, 163 Va. 957, 977, 978, 179 S. E. 507, this court held:

"The Milk Commission of Virginia is declared to be an instrumentality of the Commonwealth by an act of the General Assembly, approved March 29, 1934, Acts 1934, chapter 357, page 558. That act authorized it to divide the State into 'markets' or 'milk sheds,' and to fix a maximum and minimum price for milk within these designated areas. It further provided that it shall have control over the production of milk and may require that distributors be licensed by it. A distributor is defined as one who sells milk to con-

sumers. A consumer is one, other than a milk distributor, who purchases milk for human consumption and a producer-distributor is one who sells milk produced by himself. When a. market has once been defined, producers can sell only within that market subject to this exception only: If at the time of its establishment they are shipping milk to any other market they may continue to do so until that custom is voluntarily abandoned."

The Milk Commission is a responsible board created by law for the express purpose of regulating the production and distribution of milk. Its finding of fact on conflicting evidence is entitled to the same consideration and weight as given any other duly organized board. It is not the function of this court to act as a jury in passing upon conflicting evidence. If there is substantial evidence to support the finding of fact, such finding should be, and usually is, regarded as binding upon this court on review. There is no reason to apply a different rule to the finding of fact by the Milk Commission.

For these reasons, I think the order of the Milk Commission should be affirmed.

GREGORY, J., concurring in dissent.