In the Matter of FRIENDSHIP DAIRIES, INC., Petitioner, against C. CHESTER DU MOND, as Commissioner of Agriculture and Markets of the State of New York, Respondent.

Third Department, May 21, 1954.

*Sidney Schwartz* for petitioner.

*Robert G. Blabey* and *George G. Fiesinger* for respondent.

HALPERN, J.   This is a proceeding under article 78 of the Civil Practice Act to review a determination by the Commissioner of Agriculture, denying the petitioner's application for an extension of its milk license so as to authorize it to operate an approved fluid milk plant at Friendship, New York.

Ever since 1926, the petitioner has operated an unapproved milk plant at Friendship, New York. The petitioner purchases milk from farmer-producers in the vicinity and from milk dealers and uses the milk chiefly for the manufacture of cheese products.   The petitioner's license is limited to the purchase of milk for manufacturing only.

An approved plant is one which handles milk intended for human consumption in fluid form.   Its facilities must be approved by a health authority in the marketing area to which the milk is shipped; and an approved plant purchases its milk only from producers whose facilities have been similarly approved.   Fluid milk from the petitioner's vicinity is shipped to the New York metropolitan milk marketing area, which is administered jointly by the Commissioner of Agriculture and Markets of New York State and the Secretary of Agriculture of the United States, under regulations adopted pursuant to the provisions of sections 258-k to 258-n of the Agriculture and Markets Law and the provisions of the Agricultural Adjustment Act (U. S. Code, tit. 7, § 608c).

The farmer-producers from whom the petitioner obtains its milk supply are unapproved producers but in recent years there has been a definite trend in the direction of unapproved producers improving their facilities and becoming approved producers.   Many of the petitioner's former producers have obtained approval and have shifted their business to approved plants.   Others are in the process of improving their facilities to a point which will enable them to obtain approval.

It is obviously to the advantage of the producers to obtain approval since this enables them to sell to approved plants and to obtain the uniform or blended price as determined by the administrator under the milk marketing order.   This is a higher price than the producers are able to obtain from the operators

of unapproved plants who purchase solely for manufacturing purposes. The uniform or blended price is determined each month by the administrator on the basis of class prices which are fixed in accordance with formulas prescribed in the marketing order. Milk sold by the dealer in fluid form has the highest class price; milk used for manufacture has the lowest class price. All operators of approved plants are required to make monthly reports of the use to which they had put the milk purchased by them. A computation is made of the value of the milk at the class prices in accordance with the actual use of the milk and an average uniform price for the month is arrived at, for all the milk purchased by approved plants, subject to differentials for quality and location. The operators of approved plants are required to pay this uniform price to all their producers, regardless of the use to which the milk purchased from any particular producer had been put (see 1 N. Y. Official Compilation of Codes, Rules & Regulations, p. 163; Division of Milk Control, Order No. 126). An equalization fund or producer settlement fund is maintained by the administrator for the making of necessary adjustments. If a particular dealer's use of the milk purchased by him differs from the average use, an adjustment is made between him and the fund. If, for example, a dealer resold all his milk as fluid milk, he would have to pay into the pool the difference between the uniform price and the higher class price for fluid milk. On the other hand, if he used all the milk for the manufacture of cheese, the pool would reimburse him for the difference between the uniform price and the class price for milk used for cheese manufacture.

It is not economically feasible for the operator of an unapproved plant to pay the equivalent of the uniform price and then use the milk solely for manufacturing purposes. He would not have the benefit, which the operator of an approved plant would have, of the higher price, which milk sold in fluid form would command in the market; neither would he have the benefit of any reimbursement from the equalization fund.

The petitioner has found it necessary in the past to purchase milk from other dealers, operating either approved or unapproved plants, in order to obtain an adequate supply for its cheese manufacturing operation. The petitioner has encountered difficulty, during the seasons of the year when the milk supply is low, in obtaining an adequate supply from other dealers. Furthermore, it has often found that the price

demanded by other dealers made the milk too costly for use in cheese manufacture. These difficulties will be greatly multiplied, as more of the petitioner's producers become approved producers and shift their business to approved plants.

The petitioner therefore conceived the idea of establishing an approved plant of its own. It proposed to build a new plant in compliance with the standards specified by the New York City health department for approved plants, so that it would be allowed to deal in fluid milk and to ship milk and cream for sale in fluid form into the New York City marketing area. Under the petitioner's proposed plan of operation, it would purchase its milk from approved producers and pay the uniform or blended price. It would ship the milk as fluid milk to the New York market when called upon to do so by the administrator in periods of scarce supply and it would also, from time to time, voluntarily sell milk for resale as fluid milk when market conditions made that advantageous. However, the primary purpose of the plan was to assure the petitioner an adequate supply of milk for its cheese factory. Skim milk, left after the separation of cream in the proposed approved plant, and part of the whole milk received at the plant would be transferred to the petitioner's cheese factory. The combined operation, the petitioner believes, would be an economically feasible one. It would enable the petitioner to hold its producers, even though they had attained approved status, and to pay them the uniform or blended price and still have skim milk and whole milk left for the cheese factory operation at a net cost which would allow the petitioner to continue to sell its cheese products at a competitive price.

The only obstacle to the petitioner's putting its plan into effect was the fact that its milk dealer's license was limited to the purchase of milk for manufacturing only. The petitioner applied to the commissioner for an appropriate extension of its license but the commissioner denied the application upon the ground that there was no need for an additional approved fluid milk plant in the area. The commissioner found that the existing plants had an unused capacity which could absorb all the milk produced by the petitioner's producers upon their becoming approved producers and that to license an additional fluid milk plant in the vicinity would, in the language of section 258-c of the Agriculture and Markets Law, " tend to a destructive competition in a market already adequately served " and would not be " in the public interest ".

This highlights the nature of the petitioner's problem. According to the petitioner's view, in order to make it economically feasible for it to continue in the cheese manufacturing business, the petitioner has to enter into the new, although related, business of handling milk designed for consumption as fluid milk. But, according to the commissioner, that field is already over-crowded and an additional fluid milk plant may not properly be licensed in the petitioner's area.

It is the petitioner's contention that, if it is not allowed to establish an approved fluid milk plant, it will lose most of its producers as they shift to approved status and it will not be able to obtain a reliable supply of milk from other dealers at a reasonable price and it will therefore have to discontinue its cheese manufacturing business. Whether the denial of the license will have the dire consequences which the petitioner predicts, is open to question. There is some evidence in the record that other cheese manufacturers in the area have been able to purchase surplus milk from other dealers at prices which permitted them to continue in business. It also appears that the petitioner itself has for many years purchased a substantial part of its supply from other dealers.

In any event, even if the situation is as serious as the petitioner claims, this does not of itself entitle the petitioner to the relief it seeks. The petitioner's predicament is primarily the result of economic changes in the milk production industry in its vicinity. The occurrence of such changes, making it more difficult for the petitioner to operate its cheese manufacturing business, does not give the petitioner the right to go into the fluid milk business without satisfying the statutory standards for entry into that business. If a new fluid milk plant is not needed in the area, the petitioner is not entitled to establish one merely because it would facilitate the operation of its cheese factory.

Upon the departmental hearing, the petitioner's counsel recognized that he had to meet the issue of compliance with the statutory standards and he sought to demonstrate that the market was not " already adequately served " and that there was a need for an additional approved milk plant in the vicinity of the petitioner's proposed plant. However, on this factual issue, the commissioner's proof was much stronger than the petitioner's. The commissioner convincingly demonstrated that the existing approved plants could adequately serve all the producers in the vicinity and that there was unused capacity

available for any producer who wished to become an approved producer. In the end, the petitioner's proof amounted merely to a showing that some of its present producers preferred to continue to deal with petitioner and that others preferred to deal with a plant located in the village of Friendship rather than with a plant in a neighboring village, but these expressions of personal preference cannot be accepted as proof that a new fluid plant was needed in the vicinity.

The petitioner also raised the point that many of the existing plants dealt exclusively with the members of co-operatives, and that some of the petitioner's producers did not desire to join a co-operative. However, the commissioner met this contention by proof that there were independent plants of adequate **capacity in the vicinity** to which the producers could sell their **milk without joining** a co-operative.

In its brief in this court, the petitioner broadened its attack and took the position that the statute was not designed to regulate competition among dealers in the purchase of milk but was intended only to prevent unfair and destructive practices in their selling activities. We do not find any basis in the legislative history or in the language of the statute for this construction. It is plain on the face of the statute that the purpose of the Legislature was an all-embracing one and that it was the intention of the Legislature to stabilize the entire distribution structure of the milk industry (Agriculture and Markets Law, § 258-k). The elaborate provisions of the statute for the licensing of dealers are designed not only to prevent destructive competition among dealers in selling their product but also to prevent destructive competition in their buying of milk from milk producers. Destructive competition is equally injurious to the stability and solvency of dealers, whether it occurs in the buying or in the selling end of the business. While it is true that the primary concern of the Legislature was to assure an adequate supply of milk for the consuming public and to assure a reasonable return to the milk producers, the Legislature recognized that these objectives could not be attained unless the whole of the milk industry was stabilized in all its activities. The provisions of the statute have been uniformly construed in accordance with this view (*Matter of Grandview Dairy* v. *Du Mond,* 273 App. Div. 921, affd. 299 N. Y. 695; *Matter of Dairymen's League Co-op. Assn.* v. *Du Mond,* 282 App. Div. 69, 74, appeal on constitutional grounds dismissed 306 N. Y. 595).

Finally, the petitioner challenges the finding by the commissioner that the issuance of a license to the petitioner would tend toward destructive competition among the operators of milk plants in the vicinity. Section 258-c of the Agriculture and Markets Law, as amended by chapter 502 of the Laws of 1950, places the burden of proof on this issue upon the commissioner (*Matter of Williams* v. *Du Mond,* 282 App. Div. 76; *Matter of Echelman* v. *Du Mond,* 283 App. Div. 276). The commissioner relied, for proof of a tendency to destructive competition, principally upon the fact that there was excess capacity in the existing approved plants in the vicinity, which they had not been able to fill. He took the position that so long as there was such unused capacity, the licensing of any additional fluid milk plant would tend to a destructive competition. There may be circumstances when a distinction must be drawn between *additional* competition and *destructive* competition (*Matter of Eisenstein* v. *Du Mond,* 268 App. Div. 320) but we think that the commissioner was right in holding that no such distinction could fairly be drawn here. In the situation here presented, the additional competition resulting from the establishment of a new plant would necessarily tend to a destructive effect, within the meaning of the statute. As the commissioner pointed out in his findings, the new plant would divert milk from existing plants, which were already operating below their capacity, and thus would necessarily result in an increase of their unit cost of operation and would tend to undermine their stability and their ability to continue to operate upon a profitable basis.

It is argued that no destructive competition would result in this case, because the petitioner would simply continue to deal with the producers with whom it now deals and there would be no diversion of producers from the existing plants. The factual premise of this argument is not correct, since the petitioner expects to recapture the business of some of its former producers who are now delivering to approved plants. But apart from this, the protection of the business opportunities of the existing plants, under the scheme of the statute, extends to new producers coming into the field as well as to the old approved producers. While there would be no diversion of the patronage of the existing plants, if new approved producers went to a new plant, there would be a withholding of business which otherwise would have come to the existing plants and which would have helped them to absorb their excess capacity and to reduce their unit cost of operation.

The remaining ground specified by the commissioner for his denial of the petitioner's application was that the issuance of the license would not be in the public interest. In the situation here presented, this is but another aspect of the finding that the issuance of the license would tend to destructive competition. Under the scheme of the statute, existing plants are protected against destructive competition for the purpose of serving the public interest. " This * * * is not designed primarily for the advancement of the financial interests of the existing licensees; it is designed rather to promote the public interest, the Legislature recognizing that it is in the public interest to protect the solvency and stability of the existing licensees in order to enable them to continue to render adequate service at reasonable prices " (*Matter of Dairymen's League Co-op. Assn.* v. *Du Mond,* 282 App. Div. 69, 74, *supra*). Presumably, the stabilization of the distribution structure of the industry and the reduction of operating costs will ultimately be reflected in the prices paid by the consumers of milk and in the quality of the product received by them. The public interest will thus be directly served; at least, that is the view which has thus far prevailed in the Legislature.

The question of how best to protect the public interest is basically one of legislative policy. Up to this time, the Legislature has adhered to the view that the best way to serve the public interest with respect to the milk industry is to stabilize the milk distribution business by making it " a quasimonopoly for those already in it ", under government regulation (Manley, " Nebbia Plus Fifteen ", 13 Albany Law Rev. [part 2] 11, 18). An argument may be made the other way, by those sympathetic to the petitioner's position, that the public interest would be better served by terminating this governmental " stabilizing activity " and permitting free competition among milk dealers. But some students of the subject have made an extreme argument in the opposite direction and have urged that the " quasi-monopolistic " nature of the business should be strengthened and that the State should " gradually reduce the number of licensees so that the public can have the benefit of possible operating economies from a more completely monopolized and regulated milk distributing industry " (13 Albany Law Rev. [part 2] 18–19). These arguments raise fundamental questions of policy which are not within our province, and which only the Legislature can resolve.

We are satisfied that the commissioner has fairly applied the standards under the existing statute. We are satisfied that he has demonstrated by " a preponderance of the evidence " that the issuance of the license sought by the petitioner would tend to a " destructive competition in a market already adequately served " and that the issuance of the license is not " in the public interest " (Agriculture and Markets Law, § 258-c).

The determination by the commissioner should be confirmed, with $50 costs.

FOSTER, P. J., BERGAN, COON and IMRIE, JJ., concur.

Determination of the commissioner confirmed, with $50 costs.