## (April 5, 1956)

■ In the Matter of EDWARD G. GRIMSTEED, JR., Petitioner, against DANIEL J. CAREY, as Commissioner of Agriculture and Markets of the State of New York, Respondent.

MEMORANDUM BY THE COURT.. This is a proceeding under article 78 of the Civil Practice Act to review the determination of the Commissioner of Agriculture and Markets denying petitioner's application to sell milk at wholesale and retail in the towns of Hastings, West Monroe and Constantia, and in the villages of Central Square and Cleveland, all in Oswego County. After a hearing, the commissioner denied petitioner's application mainly upon a finding that the granting of the license would tend to a destructive competition in a market already adequately served. (Agriculture and Markets Law, § 258-c.)

The area in which petitioner desires to distribute milk is largely rural in character, with a total population of approximately 6,000. There are three dealers now licensed to sell milk at wholesale and retail in the towns of Hastings and Constantia, two are licensed for the town of West Monroe and the village of Cleveland, and one dealer has permission to sell in the village of Central Square. These dealers are McMahon's of Central Square, Inc., Byrne Dairy, Inc., of Syracuse, Iseneker Dairy Inc. of Rome, Netherland Dairy Inc. of Syracuse and Arthur Van Ry of Constantia. Some indication of the limited volume of the business conducted by these dealers may be shown by reference to the amount of milk sold by two of them. In the three towns and two villages comprising the area involved, McMahon's sells daily 693 quarts at retail and 724 quarts at wholesale; in the village of Cleveland, Iseneker sells 600 quarts a week, both at retail and wholesale; and in the town of Constantia, its weekly sales are 720 quarts at retail and 420 quarts at wholesale.

All of the milk used by McMahon's is purchased from Byrne Dairy, Inc., and each day the milk is transported from Syracuse to a cooler in Central Square and thence distributed on routes. The Byrne plant at Syracuse has a capacity of 17,000 quarts for an eight-hour shift. At the time of the hearing, it was processing 13,000 quarts, or about 78% of capacity. McMahon's purchases 15% of the Byrne Dairy output. Petitioner estimates that he would sell 350 quarts daily if he were granted a license. His sales would be largely to customers now being served by other licensees. McMahon's and Byrne Dairy would lose customers. This would cause Byrne to operate at a still lower percentage of capacity and result in a higher unit cost of operation. Other licensees would also lose customers and be forced to operate at a higher unit cost.

The present highly competitive nature of the market as a whole, the rural character of much of the area involved, the comparatively small population in the area, the number of licensees serving it, the relationship between the present output and capacity of the Byrne plant, and the demonstrated increase in the unit cost of operations to licensees in the event the application is granted furnish the preponderance of evidence necessary to sustain the finding that granting the license would tend to a destructive competition. (*Matter of Friendship Dairies* v. *Du Mond*, 284 App. Div. 147; *Matter of Jones* v. *Commissioner of Agriculture & Markets*, 1 A D 2d 920.)

Denial of a new license on the basis of a tendency to a destructive competition has been specifically limited by the Legislature to cases where the "market [is] already adequately served". (Agriculture and Markets Law, § 258-c.) Whether the market was adequately served was an issue at the hearing. An inspector employed by the Department of Agriculture and Markets testified that he sampled opinion in the area for which petitioner seeks a license and found that there was general satisfaction with the milk delivered by the present dealers and no serious complaints about the service. Petitioner swore several witnesses who testified to specific instances of receiving a poor grade of milk and unsatisfactory service. However, on the whole record, we do not regard respondent's finding that the market is adequately served as being contrary to the weight of the evidence.

We find no merit to petitioner's contentions that the determination was influenced by factors which did not constitute statutory grounds for denial and that the administrative proceeding was conducted in an arbitrary and prejudicial manner and without due process of law.

Determination confirmed, without costs.

Foster, P. J. (dissenting). The question for our determination is whether this record supports, by a preponderance of the evidence, one or more of the reasons found by the commissioner for denying the application. (*Matter of Williams* v. *Du Mond,* 282 App. Div. 76; *Matter of Friendship Dairies* v. *Du Mond,* 284 App. Div. 147.)

The area in which petitioner desires to distribute milk is largely rural in character, with a total population of approximately 6,000. There are three dealers now licensed to sell milk at wholesale and retail in the towns of Hastings and Constantia, two are licensed for the town of West Monroe and the village of Cleveland, and one dealer has permission to sell in the village of Central Square. These dealers are McMahon's of Central Square, Inc., Byrne Dairy, Inc., of Syracuse, Iseneker Dairy Inc. of Rome, Netherland Dairy Inc. of Syracuse and Arthur Van Ry of Constantia. Some indication of the volume of the business conducted by these dealers may be shown by reference to the amount of milk sold by two of them. In the three towns and two villages comprising the area involved, McMahon's sells 693 quarts at retail and 724 quarts at wholesale; in the village of Cleveland, Iseneker sells 600 quarts a week, both at retail and wholesale; and in the town of Constantia, its weekly sales are 720 quarts at retail and 420 quarts at wholesale.

The entire stock of Byrne Dairy, Inc., is owned by three Byrne Brothers. Since April, 1954, when they became the sole owners of the assets of McMahon's, all of the milk used by McMahon's has been purchased from Byrne Dairy, Inc., and each day the milk is transported from Syracuse to a cooler in Central Square and thence distributed on routes. The Byrne plant at Syracuse has a capacity of 17,000 quarts for an eight-hour shift. At the time of the hearing, it was processing 13,000 quarts, or about 78% of capacity. McMahon's purchases 15% of the Byrne Dairy output. McMahon's operated at a small loss during the first nine months it was controlled by the Byrne Brothers. If McMahon's should sustain a loss of business by reason of additional competition, it will result in a higher unit cost of operating the Byrne plant because of reduced volume. Other processors would be affected in like manner.

For several years petitioner, a resident of Central Square, has been employed as a route man by McMahon's. At present he delivers milk in Constantia, Hastings and West Monroe, and in the village of Cleveland. In the area for which he seeks a license, he estimates that he would sell 350 quarts daily. Petitioner has made arrangements to purchase the milk in bottles either from Iseneker, or Rome, or Netherland of Syracuse, and proposes to truck it to the area where he would maintain a cooler.

It is clear that under section 258-c of the Agriculture and Markets law an applicant may not be denied a license upon the ground that his competition may tend to be destructive if the market is not adequately served. Denial of a new license on the basis of a tendency to a destructive competition has been specifically limited by the Legislature to cases where "the market is already adequately served". Thus the issue of whether the market was adequately served consumed much of the hearing. An inspector employed by the Department of Agriculture and Markets testified that he sampled opinion in the area for which petitioner seeks a license and found that there was general satisfaction with the milk delivered by the present dealers and no serious complaints about the service. Petitioner swore several witnesses who testified to specific instances of receiving a poor grade of milk and unsatisfactory service, but we do not regard respondent's finding that the market is adequately served as being contrary to the weight of the evidence.

However, it seems to us that respondent's finding that issuance of a license to petitioner would tend to destroy competition is not supported by a preponderance of the evidence. The record demonstrates that granting the application would cause a number of customers to purchase milk from petitioner rather than from existing licensees, that the unit cost of processing milk sold in the area would be increased, and that some reassignment of personnel would be necessary by existing dealers. But there is no proof in the record as to the estimated increase in the cost of processing milk or the consequence of such increase upon profits. There is no proof that the increased cost of processing would materially influence the profit of any existing licensee or result in any but minor changes in operation. Thus it appears that proof is lacking of a tendency to destroy competition. It is tendency to destroy, not tendency to damage, which is made the criterion for denial of an application. (*Matter of Eisenstein* v. *Du Mond*, 268 App. Div. 320, 323.) Mere diminution of profits taken alone is not sufficient ground to refuse a license.

I do not hold that in all cases a tendency to destroy competition can only be proven by demonstrating that the issuance of a new license will produce some major adverse change in the profit of existing licensees. Some cases will exist where the nature of the market being served and the surrounding circumstances furnish the preponderance of proof necessary for respondent to find that the issuance of a new license will tend to a destructive competition. (Cf. *Matter of Jones* v. *Commissioner of Agriculture & Markets*, 1 A D 2d 920.) But in this case, considering the size of the area involved, the population contained in it, the number of dealers serving it, an inference cannot be fairly drawn that granting another license would tend to destroy competition.

Petitioner does not own a truck, milk bottles or cases to use in the proposed business and respondent has found therefore that he does not possess the equipment necessary to conduct the proposed business. We do not interpret the statute as requiring an applicant to have actually purchased equipment before filing an application. It seems to us sufficient if he has the finances necessary to equip the business. The statement in petitioner's application showing the amount of his resources has not been challenged and it appears that he is financially able to defray the cost of equipping the proposed business. The hearing representative indicated that it was not necessary for petitioner to acquire equipment in advance and respondent's brief states that he does not urge that on application for a license a new applicant must put himself to the expense of purchasing equipment. Respondent does urge, however, that if he is without equipment, an applicant should have definite plans for his proposed method of operation. We believe petitioner has shown such plans for his proposed operation.

The finding that the issuance of a license would not be in the public interest is another aspect of the finding that the issuance of a license would tend to a destructive competition. I think that the finding concerning public interest is not supported by the record.

There is no merit to petitioner's contentions that the determination was influenced by factors which did no constitute statutory grounds for denial and that the administrative proceeding was conducted in an arbitrary and prejudicial manner and without due process of law.

The determination should be annulled and the matter remitted to respondent.

Bergan, Halpern and Zeller, JJ., concur in Memorandum by the Court; Foster, P. J., dissents, in an opinion, in which Gibson, J., concurs.

Determination confirmed, without costs.