# Richmond

RICHMOND FOOD STORES, INC. v. STATE MILK COMMISSION OF VIR-
GINIA.

January 14, 1963.

Record No. 5525.

Present, All the Justices.

The opinion states the case.

*Henry T. Wickham (David J. Mays; Tucker, Mays, Moore & Reed,* on brief), for the appellant.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the appellee.

*James H. Michael, Jr.; William S. Aaron, Jr.; Michael & Dent; Walker, Woodson & Aaron,* on brief, for Norfolk Cooperative Milk Producers Association, et al., *amicus curiae.*

WHITTLE, J., delivered the opinion of the court.

Richmond Food Stores, Inc. made application to the State Milk Commission (hereinafter called the Commission) for a distributor license on the Richmond milk market. In accordance with the established procedure of the Commission, the application was forwarded to the Richmond Local Milk Board for recommendation. The Local Board recommended by a vote of three to two that the application be denied for the following reasons: (1) Approval would not be in the public interest; (2) the Richmond market is adequately served by five distributors; (3) there is no evidence of necessity for an additional distributor; and (4) there is a complete line of dairy products available in paper and glass in the Richmond area from existing distributors. The two members of the Local Milk Board dissenting were the producer members, Nuckols and Orange.

At a hearing before the Commission, evidence was presented on behalf of both the applicant and those opposing the issuance of the license. At a meeting of the Commission held on January 18, 1962, the application was denied; Commissioner Tabb, one of the three Commisioners, dissenting.

By letter dated March 6, 1962, counsel for Richmond Food Stores, Inc. received what was titled "Majority Opinion and Finding of Fact

of the Milk Commission." In addition to the reasons assigned by the Local Board for suggesting that the application be refused, the Commission assigned the additional grounds that the proposed operation would violate its Regulation No. 11 which prohibits rebates, and that no distributor should market milk "in paper only, and through its own stores only which are captive outlets, * * *."

Six assignments of error were filed by applicant which it asserts involve three questions:

1. Does § 3-360 of the Code of Virginia authorize the State Milk Commission ·to deny a distributor license on the ground that such action is in the public interest?

2. May the State Milk Commission deny an application for a distributor license on the ground that the applicant is a corporation organized under the laws pertaining to co-operative associations?

3. Does the evidence in this case show that the granting of the distributor license would be contrary to the public interest?

The statute here involved (Code, § 3-360) reads as follows:

"The Commission may require all distributors in any market designated by the Commission to be licensed by the Commission for the purpose of carrying out the provisions of this article. The Commission may decline to grant a license, or may suspend or revoke a license already granted upon due notice and after a hearing. The Commission may classify licenses, and may issue licenses to distributors to process or store or sell milk to a particular city or village or to a particular market or markets within the State."

Paragraph 4 of Regulation No. 7, titled "Distributor Licenses and Permits", passed by the Commission, reads:

"4. The Commission may decline to grant a license and may suspend or revoke a license or permit, after at least ten days' notice and a hearing, for any of the following reasons:

"A. That the action is in the public interest.

"B. That the applicant, licensee or permittee is not qualified by character, experience, financial responsibility and equipment to properly conduct the business.

"C. That the applicant, licensee or permittee has made a false statement or inaccurate report of a material fact to the Local Milk Board or the Commission.

"D. That the applicant, licensee or permittee is insolvent, has made a general assignment for the benefit of creditors or that a money judgment has been secured against him upon which execution has been returned wholly or partly unsatisfied.

"E. That the applicant, licensee or permittee has violated any of these regulations.

"F. That the purpose of the application for any type of license is to circumvent the schedule of retail and wholesale prices.

"G. That the applicant for a General Distributor License does not have facilities adequate to handle milk from assigned producers.

"H. That the general distributor licensee has not maintained facilities adequate to handle milk from assigned producers.

"I. That the licensee has rejected milk without reasonable cause.

"J. That the licensee has failed to account and make payment.

"K. That the licensee or permittee has failed to keep records or furnish information required.

"L. That any requisite health permit has been suspended, terminated or revoked.

"M. That the licensee or permittee has ceased to operate."

The facts disclose that the Richmond Food Stores, Inc. was organized as a co-operative association under the laws of Virginia. Licenses are paid to the City of Richmond and the Commonwealth. Real estate taxes and Federal and State income taxes also are paid by the corporation. Approximately 561 retail grocery stores are members of the co-operative, 309 of which are located in the Richmond milk market area. The application shows that the corporation proposes to build a plant for the purpose of operating a dairy to handle pasteurized milk and cream, the estimated cost of which would be approximately $250,000; all sales to be made to its member retail grocery outlets.

The plans submitted to the Commission met the standards established for a milk distributor with the exception of the Commission's findings that the proposed operation would violate its regulation against rebates (Paragraph 5, Regulation No. 11), and that the issuance of a license would not be "in the public interest," thus violating Rule A of Paragraph 4, Regulation No. 7. It will be noted that Rules B through M are not involved.

T. M. Ragland, Executive Officer of the State Milk Commission, testified that in 1951 there were six general distributors licensed on the Richmond milk market. This was the date the Commission began the exercise of its jurisdiction in this market. On January 28, 1953, the Commission cancelled the license of Cloverleaf Dairy, one of the six distributors on the market, thus leaving five distributors as of the date of the application here involved.

In 1952 Class I milk sales on the Richmond market were 75,115,908 pounds. The average Class I sales on the market for the years 1958, 1959, and 1960, were approximately 90,000,000 pounds.

In 1950 the population of the Richmond milk market area, with six distributors licensed thereon, was approximately 340,000. In 1960, the same market, with only five distributors, had a population of approximately 422,000.

Leonard E. Starr, Jr., General Manager of Richmond Food Stores, Inc., analyzed figures concerning the population of various milk markets under the control of the Commission. Thirteen of the nineteen markets, including Richmond, were selected indiscriminately because of the ability to accurately arrive at population figures.

The following summary shows the number of persons each licensed distributor served according to the 1960 population census:

| "Market | Population per Distributor |
|---|---|
| 1. Kilmarnock-Reedville | 5,300 |
| 2. Smyth-Wythe | 7,500 |
| 3. Brunswick-Greensville-Mecklenburg | 9,300 |
| 4. Winchester | 11,200 |
| 5. Staunton-Waynesboro | 16,900 |
| 6. Charlottesville | 18,800 |
| 7. Southwest Virginia | 19,000 |
| 8. Pulaski-Montgomery-Giles | 22,000 |
| 9. Galax | 22,900 |
| 10. Fredericksburg-Warsaw | 25,200 |
| 11. Tidewater | 38,000 |
| 12. Roanoke | 52,900 |
| 13. Richmond | 84,000." |

From the above it will be noted that if the application of the Richmond Food Stores, Inc. were granted, creating six distributors in the Richmond market instead of five as now, there would be one distributor for at least every 70,000 persons. Thus the distributors in the Richmond market would be in a rather enviable position as compared with the distributors licensed in the other twelve markets above tabulated.

The Kilmarnock-Reedville and the Staunton-Waynesboro markets each have five licensed distributors, as does the present Richmond market, with populations of 26,140 for Kilmarnock-Reedville; 75,289 for Staunton-Waynesboro; and approximately 422,000 for Richmond.

Richmond Food Stores, Inc. has member stores in seventeen milk markets controlled by the Commission. Starr, testifying for the applicant, stated that it had been determined that "in some nine markets the figures of milk sales are so low as to appear practically impossible for us to penetrate these markets under any circumstances." As to the other markets, he stated that "it might be economically feasible" to operate in the Tidewater and Federicksburg markets; that total milk sales of member retail stores as a per cent of sales in the Richmond milk market is 15.4 per cent. The percentage of milk sales now made by his member stores in the other sixteen markets to total sales in those markets is as follows:

| "Market | Percentage of Sales |
| --- | --- |
| Petersburg | 6 % |
| Kilmarnock | 45 % |
| South Boston-Halifax | 5.9% |
| Staunton-Waynesboro | 5.6% |
| Farmville | 5.2% |
| Lexington | 3.7% |
| Blackstone-Kenbridge, etc. | 14 % |
| Charlottesville | 3.8% |
| Brunswick | 4.7% |
| Harrisonburg | 1 % |
| Tidewater | 1.2% |
| Altavista | 3.5% |
| Luray | 3.1% |
| Chatham | 5.3% |
| Lynchburg | .3% |
| Fredericksburg-Warsaw | 11 % " |

Starr further testified that member stores of Richmond Food Stores, Inc. would not be required to sell milk processed only by his company but on the contrary they would be encouraged to stock not only "Richfood" brand (the brand produced by Richmond Food Stores, Inc.) but other brands.

As previously stated, the Richmond milk market is presently served by five distributors. Sealtest, one of these distributors, sells at wholesale and does not have retail home-delivered routes. Safeway Stores (Lucerne milk), another distributor in the Richmond market, sells

its milk only through its own stores. Curles Neck Dairy, Virginia Dairy, and Foremost, all have retail home-delivered routes. These latter three were the only distributors on the Richmond market who opposed the application. Several other distributors throughout the State appeared in opposition to the application as well as the Virginia Dairy Products Association, a trade association of milk distributors.

Typical of the testimony in opposition was that of Clarence L. Fleshman, Secretary and Treasurer of the Virginia Dairy Products Association, a former member of the State Milk Commission and President of Lynchburg-Westover Dairies, Inc. Fleshman stated that during the summer of 1961 he had opposed the application of the Norfolk Avenue Dairy, a general distributor on the Lynchburg milk market, to distribute Sealtest milk on the same market. At that time Norfolk Avenue Dairy's sales were approximately five per cent of the total milk sales on the Lynchburg market; Lynchburg-Westover Dairies accounting for sixty per cent; and Quality Dairy, the other Lynchburg distributor, accounting for the remaining thirty-five per cent.

At the hearing during the summer of 1961 Fleshman read a prepared statement showing that the heavy indebtedness of his dairy and Quality Dairy would not permit survival if "a predatory competition" developed, the prediction being that his dairy would "fold up" if Sealtest came into the market. In the instant case he admitted that his dairy was "not ready to fold yet", and that Quality Dairy had now been purchased by his dairy.

Fleshman's opposition to Sealtest coming into the Lynchburg market in 1961 was summarized as follows: (1) Lynchburg was then served, and adequately so, by three general distributors; (2) adequate service to the consuming public was being offered and maintained; and (3) the supply of milk was adequate.

Fleshman would not subscribe to the theory that if there is a single distributor in a milk market who is adequately meeting the public needs there should be no other. He stated that under some circumstances a second distributor should be licensed; that population and milk consumption could be factors as well as the question of competition. He concluded, however, that if two licensed distributors on any market were giving adequate service the Commission should not license a third. He stated that he presumed the Richmond Food Stores, Inc. would apply for a license on the Lynchburg market, and concluded that while the issuance of the license would not break his dairy, the remuneration would be decreased by the amount

of any sales displaced. He also stated that he did not think it was in the public interest "for an organization to capture a captive market and give only the limited service that is proposed." Fleshman admitted that the disruptive effect of granting the license to the applicant "wouldn't be too great."

On cross-examination by Commissioner Tabb, Fleshman stated that his dairy controlled approximately 85 per cent of the Class I milk sold, while the other distributor on the Lynchburg market (Sealtest) had the remaining 15 per cent of the market. Under these circumstances he said he would oppose an application for a third distributor unless it be shown that his dairy and Sealtest could not give the required service.

Edmund H. Rucker, Richmond Dairy Division of Foremost Dairies and a distributor member of the Richmond Local Milk Board, testified at great length for the opponents of the application. His testimony and the testimony of the other two opposing Richmond distributors, in the form of prepared statements, can be summarized as follows: The granting of the application would not be in the public interest for the reasons that (1) the Richmond milk market is being adequately served; (2) milk products are available from five highly competitive local distributors; and (3) there is no evidence of necessity for an additional distributor.

Rucker, as well as Robert E. Fitzpatrick of Curles Neck Dairy and James G. Rennie of Virginia Dairy, testified generally that their dairies would lose some of their profit margin if Richmond Food Stores, Inc. were granted the license, but they did not know how much. None of the dairies produced records or figures to substantiate their speculations. Fitzpatrick of Curles Neck Dairy refused to do so.

It was conceded that milk producers in the Richmond area would benefit if Richmond Food Stores, Inc. were granted a distributor license for the Richmond market. However, producers from other parts of the State appeared in opposition. B. F. Wilson Paxson, President of the Norfolk Co-operative Producers Association, testified that he was afraid that at a later date producers in his association might lose sales to Richmond producers. He also expressed the fear that Richmond Food Stores, Inc. might effect economies and ask the Commission to set a lower minimum wholesale price. On cross-examination he admitted that Economy Stores, which has an operation similar to Richmond Food Stores, Inc., had been licensed as a distributor on the Tidewater market approximately two and one-

half years ago and had not requested the Commission to reduce the minimum price of milk.

Tom Starke, Jr., President of the Southside Milk Producers Association, also testified that he was opposing the application on the ground that he was afraid the Richmond area milk producers would take sales away from other producers in the State. He stated on cross-examination that his association did not oppose the application of Economy Stores for a license on the Tidewater market since his association supplied milk to Economy.

It was conceded that Richmond Food Stores, Inc. could establish a milk plant and sell to its member stores, sixty in number, and others, in the area of Virginia not under the jurisdiction of the Commission, without obtaining a license. Likewise, Richmond Food Stores, Inc. could make a contract with one of the licensed distributors on the Richmond market to process and distribute Richfood brand milk without a license.

■ The first question presented by applicant challenges the constitutionality of the Act. Suffice it to say that in *Reynolds* v. *Milk Commission* (1935), 163 Va. 957, 179 S. E. 507, we held that the Act establishing the State Milk Commission and granting it power to regulate and control the milk industry was constitutional.[1]

■ The second question is: May the State Milk Commission deny an application for a distributor license on the ground that the applicant is a corporation organized under the laws pertaining to co-operative associations? Here applicant challenges the right of the Commission to deny a distributor license on the ground that the stockholders of the corporation may receive dividends which would constitute rebates contrary to the Commission's Regulation No. 11.

In the Commission's Majority Opinion and Finding of Fact, the following appears:

"The applicant testified that it would aggregate all profits from its entire operation including milk and that a 'patronage refund' or 'surcharge' would be returned to each member at periodic intervals. The Commission is of the opinion that such a procedure is a rebate and is prohibited by Regulation No. 11, of the Rules and Regulations for the Control, Regulation and Supervision of the Milk Industry in Virginia. This view is substantiated by the Supreme Court of New Hampshire in *Petition of Associated Grocers of New Hampshire, Inc.* (171 A. 2d 37). It is not the intent of the Commission to grant

---

[1] See also *Highland Farms Dairy* v. *Agnew*, 16 F. Supp. 575 (D.C., E. D. Va., 1936), affirmed 300 U. S. 608, 57 S. Ct. 549, 81 L. ed. 835.

a license to a distributor whose contemplated operation is in violation of the Commission's rules and regulations."

The regulation here referred to is Section 5, Regulation No. 11, the pertinent part of which reads:

"No general distributor * * * shall engage in * * * any method or device in connection with the sale of milk the result of which method or device will be to increase, or reduce, the net price to purchasers above the maximum price, or below the minimum price established."

The by-laws of the Richmond Food Stores, Inc. provide, among other things, that unless otherwise ordered by the association at a general meeting of the membership, the net savings and overcharges, after a reserve fund has been set aside, shall be distributed to the members in the proportion that each member's purchases bear to the total purchases of all members.

In this connection, T. M. Ragland, Executive Officer of the Commission, testified that there were now six distributors licensed by the Commission who operated as co-operatives in the same general way as Richmond Food Stores, Inc. proposed to operate. Here for the first time the Commission contends, as one of its reasons for denying the present application, that it "is of the opinion that such a procedure is a rebate and is prohibited by Regulation No. 11."

We hold that the denial of the application of Richmond Food Stores, Inc. on this ground is an arbitrary and capricious ruling. The Commission has no right to permit other co-operatives to operate in the same general manner as Richmond Food Stores, Inc. proposes to operate and yet deny the application on this ground. The General Assembly enacted Code, § 13.1-301 which provides that a co-operative association may be organized for the purpose of conducting a dairy business on the co-operative plan, contemplating rebates or dividends to its members, and the Commission has no right to repeal this section by the adoption of a regulation.

The third question is: Does the evidence in this case show that the granting of a distributor license to Richmond Food Stores, Inc. would be contrary to the public interest?

The Commission's conclusions for denying the distributor license to Richmond Food Stores, Inc. are found in its majority opinion which reads:

"* * * The record contains no evidence or testimony that any segment of the consuming public of the Richmond market is failing to receive completely satisfactory service from existing distributors.

"The evidence further disclosed that granting a license to .the applicant would decrease the sales of the five distributors serving the market. Decreasing the volume of sales of these distributors would increase their unit costs, seriously affecting their economic health, and ultimately cause an increase in the price of milk to the consumer. The alternatives being to limit home delivery and other comprehensive services, or go out of business entirely. All of the foregoing would be to the detriment of the public interest."

We do not agree with the conclusions here reached. As aforesaid, it is conceded that Richmond Food Stores, Inc. could establish a milk plant and sell to its member stores and others in the areas of Virginia not under the jurisdiction of the State Milk Commission without obtaining a license. Likewise it could make a contract with one or more of the existing licensed distributors on the Richmond market to process and distribute Richfood brand milk without a license. This being so, such an operation would have the same alleged effect on the present distributors as now contended by the Commission, that is, loss of sales and possible increased prices to consumers as if the applicant was granted a license to process and distribute its own brand milk.

It is clear that the Commission is here holding, in effect, that when there are already two or more existing distributors in the milk market who are rendering adequate service in supplying milk to the public, it is not in the public interest to license another distributor on that market. In so holding, the Commission creates a monopoly for the existing distributors, stifles competition, and abolishes free enterprise in the milk industry. Under the ruling of the Commission no new distributors might ever be licensed on a milk market. The Virginia Milk Act did not contemplate such a result.

The Commission takes the position that this Court is bound by its finding of fact. The statute does not so provide upon a direct appeal to this Court as in the instant case.

We agree with the observation in *Rountree* v. *State Milk Commission*, 184 Va. 777, 787, 36 S. E. 2d 613, 617, where it is said:

"Any presumption of the correctness of the findings is much weakened when the arbiter, as in this case, is a party to the controversy. It [the Commission] would be less than human if it were not interested in upholding its own action."

In *Friendship Dairies* v. *Du Mond*, 284 App. Div. 147, 131 N.Y.S. 2d 51, it was held that the burden of proof is on the Commission to show that a denial of the license is in the public interest, and there

it was held that public interest means "no destructive competition."

In *Application of Eisenstein*, 268 App. Div. 320, 51 N.Y.S. 2d 811, an application for a distributor license was denied on the ground that the issuance thereof would tend to "a destructive competition" in a market already adequately served. The New York Milk Commissioner arrived at his conclusion in that there were a sufficient number of milk distributors already on the market to buy milk from the producers, and that the granting of the application would cause "the cost per unit of operating the presently existing plants [to be] increased, and in the long run this would mean lower prices to producers * * * or higher prices to consumers, or both, which * * * 'tend to a destructive competition.' " 51 N.Y. S. 2d, at page 813.

The appellate division of the New York Supreme Court held that the Milk Commissioner's logic was "speculative and tenuous"; that a license may not be denied for a "light and trivial reason but only when in this case the granting would tend not only to damage but to destroy competition." The court then pointed out that the proposed operation by the applicant would tend to broaden and improve the milk market for the producer.

The New York court concluded by observing that competition is the opposite of monopoly, being a conflict between "purchasers of milk which they have to sell at a profit." "Damage" was distinguished from "destroy," in that the former is synonymous with impairment of effectiveness, while the latter has greater strength, meaning tending to bring about ruin.

In the instant case the granting of the license would not tend to destroy the existing distributors. As heretofore pointed out, the five Richmond distributors (only three of whom complained of the granting of this license) are in a most enviable position when compared with other distributors licensed on Virginia markets.

As aforesaid, in 1950 there were six licensed distributors on the Richmond market. Today there are only five although the population figures for the market have greatly increased.

We hold that under these circumstances the denial of the license to Richmond Food Stores, Inc. is arbitrary and capricious. In the refusal of the license the Commission serves only the interest of the distributors now doing business on the Richmond market. The granting of the license will not disturb the public interest. The consuming public will be benefited by the granting of the license as will the Richmond area producers.

As to the speculations of the three opposing distributors on the Richmond market concerning the raising of prices if this license is granted, it is sufficient to say that the Commission fixes the price of milk.

For the reasons stated, the order of the Commission denying the application of Richmond Food Stores, Inc. is reversed, and the case is remanded to the Commission with direction that the license be forthwith issued.

*Reversed and remanded.*