## Richmond

**BEATRICE FOODS COMPANY, T/A CLOVER CREAMERY COMPANY V. STATE MILK COMMISSION.**

January 18, 1965.

Record No. 5856.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Furman Whitescarver,* for the appellant.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the appellee.

*Amicus curiae* brief for Lynchburg-Westover Dairies, Incorporated; *T. Justin Moore, Jr.; Evans B. Brasfield; Hunton, Williams, Gay, Powell & Gibson.*

SNEAD, J., delivered the opinion of the court.

On January 29, 1963, Beatrice Foods Company, trading as Clover Creamery Company, made application with the State Milk Commission for a distributor's license on the Lynchburg milk market. The

Commission denied the application by a two to one decision. We granted Beatrice an appeal. Code § 3-369.

Upon receipt of Beatrice's application, the Commission referred it to the Lynchburg Local Milk Board for a recommendation. The Local Board recommended by a unanimous decision that the application "be denied because sufficient distributors are now in being on the Market and the public interest would be impaired by further dilution of the distributors' responsibility."

Later, after due notice, the Commission had a hearing at which time evidence was presented in behalf of the applicant and the objectors. Lynchburg-Westover Dairy and Norfolk Avenue Dairy, the only existing distributors in the Lynchburg market area, opposed the granting of the license. In denying Beatrice's application for a distributor's license, the majority opinion, recorded in the Commission's minutes, stated in part:

"The evidence and testimony of the two local distributors in this market disclosed that the entry into this market of the applicant would result in destructive competition to them. The manager of the Lynchburg Cooperative Milk Producers' Association, which Association supplies 89 per cent of the milk in this market, testified that it was the consensus of his Group that the granting of the license would adversely affect them.

"Therefore, the Commission is of the opinion that the denial of this license is in the public interest since:

"(1) To grant the same would cause destructive competition to the distributors in the market.

"(2) To grant the same would disturb the public interest.

"The application, therefore, is refused.

"Commissioner Louthan, dissenting."

The dominant question presented is whether the evidence shows that the granting of a distributor's license to Beatrice will tend to "a destructive competition" in the Lynchburg milk market and thus not be in the public interest.

Lynchburg milk market embraces the city of Lynchburg and five magisterial districts in the three surrounding counties. According to the 1960 census, the market area had a population of 92,147. This was an increase of 13,284 or 16.8 per cent over the 1950 census.

G. Roy Weaver, manager of Clover Creamery division of Beatrice Foods Company, testified, among other things, that Beatrice is one of the largest dairy concerns in the United States; that it operates

satisfactorily in seven of the controlled milk markets in the State and has one processing plant in Roanoke and another at Radford where all of the milk delivered in the seven market areas is processed; that it desires to operate five regular routes on the Lynchburg market; that the milk for these routes would be processed at its Roanoke plant; and that he did not know how much Class I milk would be sold.

Weaver further testified that "Any milk assigned to us, we will see that it is picked up without an additional cost to the producer * * *" and that, in his opinion, "* * * if granted a license, we would help to increase the sales of milk and give the public an additional brand of milk on the market, and also help producers by increasing Class I sales."

C. L. Fleshman, President and General Manager of Lynchburg-Westover Dairies, Inc., read from a lengthy prepared statement in which he expressed his company's opposition to Beatrice's application and the reasons therefor. He introduced an exhibit which he prepared showing, *inter alia*, that since 1951 there has been a reduction in general and producer distributors in 21 Virginia milk markets of 26 per cent; that the number of independent distributors has decreased by 53 per cent; that chain dairy operations have increased by 475 per cent, and that the processors in these markets have decreased by 59 per cent. He said "This exhibit shows that national chains are destroying the independent distributors * * *".

Fleshman stated that the Lynchburg market "is very competitive, but at present it is a stable market"; that in 1946 Lynchburg Dairy and Westover Dairy merged their operations to become Lynchburg-Westover Dairy; that another concern, Quality Dairy, was not being profitably operated and Lynchburg-Westover purchased its assets on July 1, 1961, for $837,426.13 by assuming liabilities of $419,011.13 and incurring additional liabilities of $418,415. He said: "We felt that if we could combine the three operations as one, there was a chance that the surviving corporation could be successful." He further stated that Norfolk Avenue Dairy had about 12 per cent of milk sales and his company had approximately 88 per cent of the Lynchburg market; that in 1962 Lynchburg-Westover's profit was one-third of a cent per quart whereas the national average was one-half of a cent per quart; that if Beatrice's license was granted the local economy would be damaged because its milk would not be processed locally, and that "it would be destructive competition to our company." Fleshman testified to other facts and introduced other exhibits containing statistical data. In the view we take of

the case, it would prolong this opinion unnecessarily to discuss them.

H. M. Crowder, a certified public accountant who commenced auditing the books of Lynchburg-Westover in 1961, testified that during that year the company's profit was .06 per cent of sales, in 1962 it was 1.35 per cent, and that the national average of milk delivered is "800 quarts per route per day". He introduced in evidence exhibits 7 and 8 which he prepared. Exhibit 7 was entitled:

"Lynchburg-Westover Dairies, Incorporated

"Pro-Forma—Profit and Loss Statement

"Showing Decrease In Milk Sales."

This exhibit was based upon 1962 figures and stated, among other things, that 76.5 per cent ($1,817,156.93) of Lynchburg-Westover's total sales was for milk in the Lynchburg market and that if there was a 6.64 per cent decrease in Lynchburg-Westover's milk sales on this market the company would only break even. The exhibit indicated that if Lynchburg-Westover's milk sales were decreased by five routes (requested by Beatrice) at 400 quarts per day, five routes at 600 quarts per day, or five routes at 800 quarts per day, it would cause Lynchburg-Westover to lose annually $27,560.72, $65,141.75 and $102,651.17 respectively.

Exhibit 8 dealt with the effect that Beatrice's proposed operations would have on all of Lynchburg-Westover's operations, both those under the Commission's jurisdiction and those outside of it. This exhibit stated that if Beatrice had five 400 quart routes Lynchburg-Westover's profits would be reduced to $1,329.46 per annum; that five 600 quart routes would cause the company a loss of $35,008.54, and that five 800 quart routes would produce a loss of $72,517.96.

T. J. Chaffin, Jr., operator and one of the owners of Norfolk Avenue Dairy, also testified in opposition to the granting of a distributor's license to Beatrice. In 1961 Norfolk Avenue, which had been a distributor for years, became a sub-distributor for Sealtest, a division of National Dairy Products Company, on the Lynchburg market. Sealtest's milk was not processed locally. Chaffin made it clear that he was speaking for himself as an individual and not for Sealtest. The record does not show that Sealtest opposed Beatrice's application for a license.

Chaffin stated that at the time Norfolk Avenue became a sub-distributor for Sealtest it had five per cent of the sales of Class I milk on the Lynchburg market; that sales had grown since then to twelve per cent, and that his company operated seven truck routes which averaged between 600 and 700 quarts per truck each day.

He presented no figures concerning his company's financial status, but had this to say:

"I am one of the little fish who managed to survive. I am the last producer-distributor of some twenty-two or twenty-five who were on the Lynchburg Market * * *. Currently, I have just reached a point where I can begin to realize that I will continue to survive. Prior to acquiring this distributorship, I was financing a losing battle." He further stated "I am in opposition to the granting of this license, because I have a feeling it will place me again in a financial bind, financial jeopardy."

J. J. Andrews, Secretary of the Lynchburg Chamber of Commerce, in opposing Beatrice's application stated that he did not "see where it will help the producer or the consumer one bit. They [Beatrice] will add nothing to the community, they will have no investment in the community * * *", and that if Lynchburg loses all of its local processors, a situation will develop where the producers and consumers will "suffer" from a price standpoint because of increased transportation costs. He further testified that "unless there is enough business for two processors in the area, I don't even think you [Commission] are doing Beatrice Foods a favor by bringing them into an area where there is not enough business for both of them to make a profit."

J. A. Overstreet and C. S. Elliott, officers of Lynchburg Co-operative Milk Producers Association, testified that the Association's members opposed Beatrice's application; that the producers have enjoyed a very satisfactory relationship with the existing distributors and prefer to deal with them; that an additional distributor was not needed on the Lynchburg market, and that the granting of the license would adversely affect the producers.

The underlying principles here involved were set forth in *Richmond Food Stores, Inc.* v. *State Milk Commission*, 204 Va. 46, 56, 57, 129 S. E. 2d 35. We there stated:

"It is clear that the Commission is here holding, in effect, that when there are already two or more existing distributors in the milk market who are rendering adequate service in supplying milk to the public, it is not in the public interest to license another distributor on that market. In so holding, the Commission creates a monopoly for the existing distributors, stifles competition, and abolishes free enterprise in the milk industry. Under the ruling of the Commission no new distributors might ever be licensed on a milk market. The Virginia Milk Act did not contemplate such a result.

"The Commission takes the position that this Court is bound by its finding of fact. The statute does not so provide upon a direct appeal to this Court as in the instant case.

"We agree with the observation in *Rountree* v. *State Milk Commission*, 184 Va. 777, 787, 36 S.E.2d 613, 617, where it is said:

" 'Any presumption of the correctness of the findings is much weakened when the arbiter, as in this case, is a party to the controversy. It [the Commission] would be less than human if it were not interested in upholding its own action.'

"In *Friendship Dairies* v. *Du Mond*, 284 App. Div. 147, 131 N.Y.S. 2d 51, it was held that the burden of proof is on the Commission to show that a denial of the license is in the public interest, and there it was held that public interest means 'no destructive competition.' "

We do not agree with the majority opinion of the Commission which held that a denial of Beatrice's license was in the public interest, since "to grant the same would cause destructive competition to the distributors in the market" and "would disturb the public interest." The effect of such holding is to stifle competition and create a monopoly; hence it should be supported by clear and convincing evidence.

Lynchburg-Westover relied heavily upon Crowder's exhibits 7 and 8 to show that the granting of the license to Beatrice would cause destructive competition in the Lynchburg market. Crowder admitted that Lynchburg-Westover would suffer the same loss if Norfolk Avenue, its present competitor, should gain 6.64 per cent of the milk sales in the area, and he conceded that he failed to take into consideration the possibility of gains which would offset the theoretical projected losses indicated by the exhibits. He was asked by Commissioner Louthan:

"Q. While they are losing those sales, would they be gaining any?

"A. That I can't tell you, sir.

"Q. You can't tell what they would be losing either, can you?

"A. No, sir. I say, 'if' they lose it.

"Q. Why don't you say if they 'gain' something?

"A. If they gain the same amount, it would be a different picture entirely."

The record shows that in 1958 Class I milk sales in the market were 16,863,835 pounds and had increased each year until they reached 21,928,688 pounds by the end of 1962. Crowder did not give consideration to the normal rise in Class I sales in preparing his

statements. He was asked: "Wouldn't it be a fair thing to do?" His reply was: "Could be." Between 1950 and 1960 the population increased by 16.8 per cent or an average rate of 1.68 per cent each year, but Crowder did not consider any future increase in population as a factor in preparing his exhibits.

The record further shows that Quality Dairy was merged with Lynchburg-Westover after it ceased operations as a subsidiary of Lynchburg-Westover; that the plant was vacant and had not been used since that time, and that the fair market value of the real estate and equipment was about $564,000. Both of Crowder's exhibits carried as an item of expense under "Other Deductions" the sum of $53,726.43. Crowder explained that "the majority of it is interest on indebtedness of the Lynchburg-Westover Dairies." He was asked:

"Q. How much of your operating expenses or other deductions are on debt?

"A. Practically all of the other deductions are on debt. It's a very small amount.

"Q. $53,000?

"A. Yes, sir.

"Q. $53,726.43?

"A. Yes, sir."

Beatrice argues that Lynchburg-Westover should not be permitted to include as an operating expense interest incurred by reason of the purchase of Quality Dairy, an unprofitable business, since the property, plant and equipment were acquired to eliminate competition and are not used in its operations. We think the acquisition was more in the nature of an investment and the interest on the indebtedness should not be included as an annual expense for operating the dairy business.

The elimination of this item from the exhibits or statements coupled with the failure to balance the anticipated gains that may be derived from the growth in population and the annual steady increase in milk sales against the anticipated losses renders the statements incomplete, inaccurate, speculative and of little probative value for our purposes. Thus, it is readily apparent that Lynchburg-Westover could stand to lose considerably more than 6.64 per cent of its milk sales before reaching the break even point.

It is a matter of common knowledge that fair, open and legal competition is in the public isterest. "Competition is the opposite of monopoly, being a conflict between 'purchasers of milk which

they have [hope] to sell at a profit.'" *Richmond Food Stores, Inc. v. State Milk Commission, supra,* 204 Va. at p. 57.

As has been stated, ·Lynchburg-Westover and Norfolk Avenue Dairies are the only distributors on the Lynchburg milk market. One of them controls 88 per cent of all milk sales, and the other controls the remaining 12 per cent. By not granting a license to Beatrice, a third distributor, the Commission has created a monopoly for the existing distributors, stifled competition, and abolished free enterprise in the milk industry. *Richmond Food Stores, Inc. v. State Milk Commission, supra,* 204 Va. at p. 56. See also *Brown v. Milk Commission,* 205 Va. 18, 21, 135 S.E. 2d 98.

We hold that the objectors and the Commission have failed to show by clear and convincing evidence that the granting of a distributor's license to Beatrice would cause destructive competition on the Lynchburg milk market. Hence, it is in the public interest that the license be issued.

For the reasons stated, the order of the Commission refusing the application of Beatrice Foods Company is reversed, and the case is remanded to the Commission with direction that the license be issued forthwith.

*Reversed and remanded.*