## Staunton

CHARLES S. ROLLER, JR., TRADING, ETC., ET AL. (JANET S. ROLLER, LINDA MOORMAN, ROLLER LIVICK AND MALCOLM HARRIS LIVICK, CO-EXECUTRICES, EXECUTOR AND TRUSTEES UNDER THE WILL OF CHARLES S. ROLLER, JR., DECEASED, SUBSTITUTED APPELLANTS) V. STATE MILK COMMISSION.

September 11, 1963.

Record No. 5613.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*Richard W. Smith* (*Timberlake & Smith,* on brief), for the appellants.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

■ This appeal resulted from an order of the State Milk Commission, appellee, denying the joint application of Augusta Military Academy, which was owned solely by Charles S. Roller, Jr., (died after appeal was awarded) and Staunton Military Academy, a corporation, appellants, for a producer-distributor's license on the Staunton-Waynesboro milk market.

Upon receipt of the application, in accordance with the established procedure of the Commission, it was forwarded to the Staunton-Waynesboro Local Milk Board for recommendation. After a hearing the Local Board recommended by a unanimous vote that the application be denied for the reasons that (1) it was obvious that the purpose of the application is to circumvent the schedule of wholesale and retail prices in violation of the Commission's Regulation No. 7, 4F; (2) there was a sufficient supply of milk in the market supplied by five distributors; (3) there was constantly a surplus of milk in the market; (4) there were on file numerous prior applications for a producer's license and base on the market, dating from 1947, which have not been granted; (5) the granting of a new producer-distributor's license would create more surplus milk for existing licensed producers; (6) approval of the application would, "insofar as the producer element is concerned", place the applicants ahead of those already on file contrary to the Commission's regulation; (7) the applicants had not previously applied for a producer's license in this market, and (8) the approval of the application would establish a precedent permitting other producers or producer-distributors applying for a base the "open opportunity" to secure one and "reduce to shambles the control in this area as set forth in the Virginia Milk Commission Law."

After due notice, a hearing on the application was held February 23, 1962, by the State Milk Commission. Evidence was presented in favor of and in opposition to the issuance of the license requested. The Commission took the matter under advisement and later informed the applicants that their application had been denied. In their "Opinion and Finding of Fact", the Commission assigned as reasons for the refusal of the application those enumerated by the Local

Board and the additional reason that the granting of the license "would not be in the public interest."

The appellants have resolved their assignments of error into two basic questions. First, are they required under the law to obtain a license from the Commission in order to produce milk solely for use at their private boarding schools? and second, was the action of the Commission in denying the license applied for invalid as being arbitrary, capricious and unreasonable?

The record discloses that Augusta Military Academy, sometimes called A.M.A., and Staunton Military Academy, sometimes called S.M.A., are privately owned military preparatory boarding schools. A.M.A. is located in Augusta county and had 546 students enrolled at the time evidence was adduced before the Commission. S.M.A. is located in the city of Staunton and had 637 students. Each school charges one fee listed as "tuition" and there is no break-down or charge allocated for room, board, specific food or milk. The students are permitted to drink as much milk as they desire. The tuition is the same regardless of whether one drinks milk or not.

Prior to the fall term of 1961, A.M.A. purchased milk from Staunton Creamery, a licensed distributor in the Staunton-Waynesboro milk market, at a cost of 92¢ per gallon. It used 24,000 gallons of milk during the 1960-61 school year. S.M.A. purchased milk from Augusta Dairies, also a licensed distributor in that market, during the same period at the same cost. It used 16,068 gallons of milk during the 1960-61 school year. Both schools would have purchased approximately the same quantity of milk during the 1961-62 term had they continued to buy from the dairies.

On August 15, 1961, the two schools entered into a written agreement with G. E. McAllister and his wife, whereby they leased from the McAllisters for the term of one year their 367 acre dairy farm in Augusta county, 80 cows, and all equipment used in operating the farm and in processing milk for a consideration of $6,000 per annum. The McAllisters did not have a milk producer's "base" in the Staunton-Waynesboro market.

At the same time, the two schools entered into a written contract of employment with McAllister as manager of the farm for a period of one year at a salary of $4,000. The contract contained, among other things, a provision for the payment of certain bonuses to McAllister as an incentive for him to operate the dairy farm in an efficient manner. It provided that he was "entitled to all surplus

milk produced and may use or dispose of the same in any lawful manner." The schools and McAllister were of opinion that no license from the Commission was required for the operations.

Thereafter, the schools used the milk they produced and processed at this farm. Their cost amounted to 78 cents per gallon. The production and processing of this milk were inspected by health officials. The Commission was advised of the arrangement by the Local Milk Board and at their request H. J. Wooten, the Commission's audit supervisor, was directed to investigate and make a report of the situation. Based on his report and "other material", the Commission determined that the operations came within the definition of "distributor" as contained in § 3-346, Code of Virginia. It was decided that since neither school held a distributor's license "they must discontinue the arrangement referred to above unless and until the necessary license is obtained from the Milk Commission." T. M. Ragland, the executive officer of the Commission, was directed to notify all interested parties accordingly.

As a result of this notice a conference was held between counsel for the schools, the executive officer of the Commission and the Assistant Attorney General assigned to represent the Commission. Thereafter, counsel for the schools wrote to the executive officer reviewing some of the things said at the conference. In it he stated: "Although we do not agree that the furnishing of milk by the schools to their students, as a part of their board, constitutes a 'sale', we nevertheless wish to cooperate and to comply with all reasonable requests of the Commission." In response to this letter, counsel for the schools was advised that the application for a license should be filed not later than January 2, 1962, which was done.

Although the application was for a producer-distributor's license, it is clear from the record that they only desired to produce milk for consumption at their schools and not for the purpose of distributing it on the market.

The record contains many other facts and figures, but they need not be related here in the view we have taken of the case.

The crucial question presented is whether the schools are required to obtain a license from the Commission in order to produce milk for their exclusive use in the respective schools. The Commission contends that a distributor's license is required for such operations.

Section 3-360, Code 1950, provides:

"The Commission may require all distributors in any market designated by the Commission to be licensed by the Commission for the

purpose of carrying out the provisions of this article. The Commission may decline to grant a license, or may suspend or revoke a license already granted upon due notice and after a hearing. The Commission may classify licenses, and may issue licenses to distributors to process or store or sell milk to a particular city or village or to a particular market or markets within the State."

Section 3-346, Code 1950, contains these "Definitions":

"As used in this article, unless otherwise stated and unless the context or subject matter clearly indicates otherwise:

\*       \*       \*       \*       \*       \*       \*

" *'Distributor'* means any of the following persons *engaged in the business of* distributing, marketing, or in any manner handling fluid milk, in whole or in part, in fluid form for consumption in this State: (Emphasis added.)

"I. Persons, irrespective of whether any such person is a producer:

"(a)  who pasteurize or bottle milk or process milk into fluid milk;

"(b)  who sell or market fluid milk at wholesale or retail, (1) to hotels, restaurants, stores or other establishments for consumption on the premises, (2) to stores or other establishments for resale, or (3) to consumers;

"(c)  who operate stores or other establishments for the sale of fluid milk at retail for consumption off the premises.

"II. Persons wherever located or operating, whether within or without the State, who purchase, market or handle milk for resale as fluid milk in the State.

" *'Producer'* means any person, irrespective of whether any such person is also a distributor, who produces milk *for sale* as fluid milk in the State. (Emphasis added.)

" *'Producer-distributor'* means a distributor who handles only milk produced by himself."

The Commission contends that the actions of the appellants place them within the definition of a "distributor" as set forth in I. (a) of the above Code section, because they are "engaged in handling" fluid milk for consumption in this State and pasteurize or process milk into fluid milk. They do handle and process milk for consumption in this State, but the statute reads that persons must be "engaged in the business of" doing these things before a distributor's license may be required. These private schools are engaged in the business of education, and incidental thereto produce and process milk solely for their own use at the institutions. There is no sale of

the milk to the students. All pay the same tuition whether or not they drink milk. Can it be successfully contended that the schools are engaged in the bakery business if they bake bread for their own use? We think not. Thus, it is evident that the schools are not "distributors" of milk within the meaning of the Act. The appellants cannot be classified as "producers" under the Act, because they do not produce milk "for sale".

The record shows that counsel for the schools made the following statement at the hearing before the Local Milk Board:

"[T]he disposition of surplus milk, as shown on the application, to Whitehouse Division, A & P Stores, Fork Union, Va., was handled by the schools themselves and that payment for this milk was made directly to the schools."

McAllister testified that the surplus milk disposed of was not processed milk and was "ungraded milk." What use is made of the surplus milk disposed of is not shown by the record. Under his contract of employment with the schools he was entitled to surplus milk produced, if any, and he could use or dispose of it "in any lawful manner." The surplus milk was, therefore, his property and when the schools sold it they of necessity acted as his agent. Whether or not McAllister is required to have a license from the Commission in order to dispose of any surplus milk is another question and is not an issue before us.

Our conclusion is that the appellants, Augusta Military Academy and Staunton Military Academy, are not required to obtain a license from the Commission in order to produce milk to be used exclusively in the respective schools. Such being the case, we do not reach the question of whether the action of the Commission in denying the license applied for was invalid as being arbitrary, capricious and unreasonable.

■ The Commission asserts that in event the appellants prevail in this appeal the costs incurred should not be assessed against it. This position is based on the premise that the Commonwealth is exempt by statute from paying such costs.

Section 14-178 provides: "In every case in the Supreme Court of Appeals, costs shall be recovered in such court by the party substantially prevailing." We have held that the terms of this section are mandatory. *McCready* v. *Lyon*, 167 Va. 103, 112, 187 S. E. 442. Section 14-197 reads: "In no case, civil or criminal, except when otherwise specially provided, shall there be a judgment for costs

against the Commonwealth." This latter section is a specific limitation on the general provision set out in § 14-178.

The operations of the Commission are not supported by general taxation. Assessments are made on the local boards based on the quantity of milk and cream handled by the distributors and sold by the producers in each market in which the Commission operates. (§ 3-373, Code 1950, as amended.) These assessments are paid by the Commission into the State treasury to the credit of the "Milk Commission account." (§ 3-374) While the Commission has been declared by the General Assembly to be "an instrumentality of the Commonwealth" (§ 3-352), it is not "the Commonwealth" within the meaning of § 14-197. Moreover, in *Food Stores* v. *Milk Commission*, 204 Va. 46, 129 S. E. 2d 35, and in *Rountree* v. *State Milk Comm.*, 184 Va. 777, 36 S. E. 2d 613 costs were assessed against the Commission.

Since we conclude that no license is required from the Commission for appellants' operations, the appellants have prevailed on this appeal. The appellants will therefore recover their costs from the Commission, and the proceedings are

*Dismissed.*