## Richmond

COMM. OF VIRGINIA, EX REL
STATE WATER CONTROL BOARD

v.

COUNTY UTILITIES CORPORATION and
KEMPSVILLE UTILITIES CORPORATION

April 30, 1982.

Record No. 791336.

Present: All the Justices.

John R. Butcher, Assistant Attorney General; Timothy G. Hayes, Assistant Attorney General (Marshall Coleman, Attorney General, on briefs), for appellant.

Robert R. MacMillan (E. Leslie Cox; Breeden, Howard & MacMillan, on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

The State Water Control Board (Board) appeals from decrees entered by the circuit court which found certain actions by the Board, purporting to control the discharge of treated domestic sewage in the City of Virginia Beach, to be unenforceable and void.

County Utilities Corporation (County) is a privately owned utility which collects sewage from the Birchwood Gardens subdivision and discharges the treated effluent into Buchanan Creek, a tributary of the Lynnhaven River. Kempsville Utilities Corporation (Kempsville) is a privately owned utility which collects sewage from the Carolanne Farms subdivision and discharges the treated effluent into the Eastern branch of the Elizabeth River. The utilities have been in operation since 1956 and 1959, respectively.

Although the Board has never complained that the utilities were inefficient, or poorly operated, or that they were producing an effluent which degraded the receiving waters, it became concerned during the early 1960's with growths or "blooms" of algae in the receiving waters. The Board determined that the "blooms" were caused by nitrogen and phosphorus, which acted as nutrients for plant growth. The nutrients were being discharged into the watersheds by some 30 dischargers of sewage and other wastes. All of the dischargers, except the appellee utilities, have now ceased to discharge nutrients. The other dischargers have either "internalized" their operations or connected to the lines of the publicly owned utility in the area, Hampton Roads Sanitation District (HRSD).[1] The evidence shows, however, that the greatest sources of nutrients in the receiving waters are those over which the Board has no control. Among these are agricultural drainage, waterfowl

---

[1] HRSD produces an effluent of lower quality than that of the appellee utilities. However, it directs it elsewhere, primarily into Chesapeake Bay which, in the Board's view, is less sensitive to the effects of nutrients. There is a factual dispute, which we need not resolve, as to whether tidal action causes HRSD's effluent to have a more detrimental effect upon the Lynnhaven River than that caused by County's continuing operations.

and other wild life, and especially the runoff from the city's storm drains in times of heavy precipitation.

In an effort to reduce the nutrient content of these particular receiving waters, the Board in 1967 adopted "Special Standards 'j' and 'k'." Special Standard "j" was labelled "Objective for Nutrients." It provided that effluents could not contain more than 0.5 milligrams per liter of nitrogen nor more than 1 milligram per liter of phosphorus at any time. Special Standard "k" required that "all existing discharges in accordance with 'j'" were to substantially remove the nutrients in their effluents or connect to HRSD.

The Board concedes that the requirement of "j" with respect to nitrogen is now and has always been unattainable by any known technology. The evidence, in fact, shows that it requires a lower nitrogen content than that contained in natural rain. Nevertheless, the Board contends that it has the authority to impose standards which are admittedly unattainable, in the interest of improving the quality of the waters, as long as the dischargers are left with the alternative of connecting to HRSD. The utilities argue that such action is arbitrary and unreasonable. As we see it, this question frames the dispositive issue in the case.

The powers and duties of the Board are to be found in the State Water Control Law, c. 3.1 of Title 62.1 of the Code, (§62.1-44.2, et seq.). The Board's declared purposes are to reduce existing pollution, prevent increased pollution, and safeguard the clean waters of the State from pollution. §62.1-44.2. It is required to make appropriate studies of water quality and, after due notice and hearing, to establish and enforce standards of water quality. §62.1-44.15. The discharge of wastes into the State waters is to be limited by certificates issued by the Board, and subject to the conditions contained therein. Such certificates may be modified, amended, or revoked by the Board from time to time, after due notice and hearing. §62.1-44.5 and §62.1-44.15(5). Sewage treatment is regulated by Article 4 (§62.1-44.18, et seq.), which provides that such treatment plants shall be under the joint supervision of the Board and the State Department of Health. The Board has the power to amend, revoke, and modify discharge certificates to assure compliance with its established water control standards. §62.1-44.19. Any owner aggrieved by a final decision of the Board in this respect may have judicial review in an appropriate circuit

court pursuant to §62.1-44.29 which sets forth a detailed procedure for such cases.

In addition to the foregoing statutory framework, the Congress enacted extensive amendments to the Federal Water Pollution Control Act in 1972, reenacted as part of the Clean Water Act of 1977, P.L. 95-217, 91 Stat. 1566, 33 U.S.C. 1251, *et seq.* These laws were aimed at the elimination of the discharge of pollutants into waters of the United States by 1985 (§1251(a)(1)) and they preserved the rights and responsibilities of the States to eliminate pollution (*id.* §1251(b)). They also established the National Pollutant Discharge Elimination System (NPDES) which prohibits the discharge of pollutants without a valid "NPDES permit." The permit is to be issued by competent authority to each discharger, conditioned to conform to established water control standards. Section 1311(b) requires that by July 1, 1977 every discharger meet an effluent quality attainable by the application of the best practicable control technology currently available or meet any more stringent standard set by the State. The administrator of the Environmental Protection Agency reviewed Virginia's standards pursuant to §1313(a) and, on March 31, 1975, authorized Virginia to administer the NPDES program within the State, pursuant to §1342(b). The Board thereupon began to issue NPDES permits pursuant to the federal law which also incorporated the requirements of the discharge certificates mandated by State law.

In November, 1975, after receiving a staff report pointing out the impracticability of "Special Standard 'j'," the Board sent the appellee utilities drafts of proposed NPDES permits which would have established an interim limitation of 2.0 mg/1 of *ammonia* nitrogen, a final limitation of 1.0 mg/1 of phosphorous and a future final limitation of 0.5 mg/1 of *total* nitrogen "as soon as possible on a time frame consistent with demonstrated technology." In September 1976 the Board issued an actual NPDES permit to Kempsville containing these provisions. However, in November 1976 the Board, without notice, issued an NPDES permit to County lacking the above limitations and in effect directing County to abandon the treatment of sewage and to connect its lines to HRSD by July 1, 1977. County and Kempsville have officers and directors in common. When the President of County (Vice-President of Kempsville) informed the Board of his intention to appeal County's case to the circuit court, he was told that if he did so, Kempsville's more permissive NPDES permit would

be withdrawn and it, too, would be required to connect to HRSD by July 1, 1977. When County noted its appeal to the court, the Board did just that. The utilities now stand upon the same footing.

After disposing of pre-trial motions, the court tried the cases together for four days in February 1979. The court entered final decrees on June 8, 1979, incorporating a memorandum opinion, vacating the actions of the Board as "unreasonable, arbitrary, capricious, confiscatory, unconstitutional and void." The decrees modified the NPDES permits in accordance with the court's opinion and extended them to June 30, 1982. The Board's appeal raises a number of issues, not all of which require discussion.

■ The Board argues that the utilities' appeal to the circuit court should have been dismissed because they failed to file a petition for appeal within 30 days after notice of appeal, pursuant to this court's Rule 2A:4. Part 2A of the Rules was adopted, as Rule 2A:1 states, pursuant to §9-6.14:16 of the Code, part of the Administrative Process Act. That section provides:

> Any party . . . aggrieved by and claiming unlawfulness of a case decision, as . . . defined in 9-6.14:4 of this chapter . . . shall have a right to the direct review thereof either (i) by proceeding pursuant to express provisions therefor in the basic law under which the agency acted or (ii) in the absence, inapplicability or inadequacy of such special statutory form of court review proceeding, by an appropriate and timely court action . . . in the manner provided by the rules of the Supreme Court of Virginia.

The actions of the Board in question here were "case decisions" as defined by Code §9-6.14:4. *See Va. ABC Comm.* v. *York St. Inn,* 220 Va. 310, 257 S.E.2d 851 (1979). The "basic law under which the agency acted" was the State Water Control Law, Code §62.1-44.2, *et seq.* This contains a detailed procedural scheme for judicial review of actions by the Board, set forth primarily at §62.1-44.29. Thus its procedures apply and those of Part 2A of the Rules do not. The statutory procedure requires only a notice of appeal within 30 days after the case decision, and transmission of the record thereafter. No petition for appeal is required. Thus the trial court properly overruled the Board's motion to dismiss.

■ The trial court ruled that the Board's action was confiscatory, *i.e.,* a "taking" of the utilities' property without compensa-

tion in violation of art. I, §11 of the Virginia Constitution and Code §56-8, which specifically prohibits the taking of the property of a utility without just compensation. The record discloses that connection to HRSD would leave the utilities' collector lines in operation and have no effect on the rates charged to customers. Since the cost of construction of the treatment facilities has long been recaptured, the utilities are allowed no rate of return on them and realize no profit therefrom. Abandonment of treatment facilities would have no effect on the utilities' continuation in business, operating profit, or value as going concerns. There is, however, presently no economically feasible alternative use for the abandoned structures or the land on which they stand.

We disagree with the court's holding that these facts render the Board's actions confiscatory. The control of discharges into the waters of the State, where properly administered, is a valid exercise of the State's police power, entrusted to the Board by the State Water Control Law. All citizens hold property subject to the proper exercise of the police power for the common good. *Sanitation Commission* v. *Craft,* 196 Va. 1140, 1148, 87 S.E.2d 153, 158 (1955). Even where such an exercise results in substantial diminution of property values, an owner has no right to compensation therefor. *Miller* v. *Schoene,* 276 U.S. 272 (1928), *Hadacheck* v. *Sebastian,* 239 U.S. 394 (1915). In *Penn Central Transportation Co.* v. *City of New York,* 438 U.S. 104 (1978), the Supreme Court held that no taking occurs in these circumstances unless the regulation interferes with all reasonable beneficial uses of the property, taken as a whole. In *Bridgeport Hydraulic Co.* v. *Council on Water Co. Lands,* 453 F.Supp. 942 (D. Conn. 1977), *aff'd.,* 439 U.S. 999 (1978), the court held that in the case of a regulated utility, the State may, under the police power, impose controls that are even more stringent than those that can be impressed upon other private property owners. Since the trial court's determination is affirmed on other grounds, however, this error is harmless.

The utilities assigned as cross-error the court's ruling that Code §62.1-44.19:1, Acts 1972, c. 840, is constitutional. This section provides that whenever the Board determines that a utility in Virginia Beach is polluting a stream, the Board is empowered to direct the utility to cease the discharge or connect to "central facilities" within one year. The utilities argue that this section is special legislation which applies only to them and not to others

similarly situated, denying them the equal protection of the laws. It is unnecessary to decide this question, since the Board concedes that it did not rely on this section for its authority. Instead, says the Board, it relied on §62.1-44.15, which authorized it to adopt standards, enforce them, and issue conditional certificates for the discharge of wastes.

■ The Board assigns error to the trial court's decision to admit evidence concerning the technical validity, practical feasibility and effect of its water quality standards. It argues that in so deciding the court went beyond the scope of judicial review authorized by law. The Board points to Code §62.1-44.15 and Code §62.1-44.24. Section 62.1-44.15 authorized it to adopt and modify standards of quality for State waters after notice and hearing. Section 62.1-44.24 provides in part:

> (1) The validity of any standard, policy or regulation may be determined upon petition for a declaratory judgment thereon brought within ninety days after the effective date thereof addressed to the Circuit Court of the city of Richmond by any owner who might be adversely affected by its enforcement and who alleges that it is invalid. The Board shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the petitioner has first requested the Board to pass upon the validity of the rule in question.
> (2) The court shall declare the standard, policy or regulation invalid if it finds that it is unconstitutional or exceeds the statutory authority of the Board or was adopted without compliance with the procedures prescribed in this chapter or is unreasonable, arbitrary, capricious, and not in the public interest.

The Board contends that such a proceeding is the sole method of challenging the validity or propriety of a duly adopted water quality standard. It argues that since "Special Standards 'j' and 'k' " were adopted in 1967 and re-adopted in 1970 after due notice and public hearing, and since no declaratory judgment proceeding was ever instituted to challenge them, they are now beyond judicial review. We disagree.

Code §62.1-44.24 is permissive in its application. It affords an opportunity to "any owner who might be adversely affected" to

seek judicial review of acts by the Board having general application, *i.e.,* standards, policies, and regulations, before he has suffered any injury by a "case decision" directly affecting his interests. It does not immunize the Board's standards, policies, and regulations from attack by an owner aggrieved by an allegedly unlawful case decision based upon them.

 Code §62.1-44.29, under which this proceeding was brought, is available to any "owner aggrieved by a final decision of the Board" which directly affects his interests. This section provides in part:

> (6) The court, sitting without a jury, shall hear the appeal on the record transmitted by the Board and such additional evidence as may be necessary to resolve any controversy as to the correctness of the record. And the court, in its discretion, may receive such other evidence as the ends of justice require.
>
> (7) The court may affirm the decision of the Board or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellant have been prejudiced because the findings, conclusions or decisions are (a) in violation of constitutional provisions; or (b) in excess of statutory authority or jurisdiction of the Board; or (c) made upon unlawful procedure; or (d) affected by other error of law; or (e) unsupported by the evidence on the record considered as a whole; or (f) arbitrary, capricious, or an abuse of discretion.

These subsections expressly authorize the court, after reviewing the Board's record, to "receive such other evidence as the ends of justice require."[2] Among other inquiries, the court is to determine whether the Board's decision was "arbitrary, capricious or an abuse of discretion." In this framework we do not accept the Board's view that the propriety of "Special Standards 'j' and 'k' " is now beyond judicial review. In order to determine whether the Board's decisions affecting the rights of appellee utilities were arbitrary, capricious, or an abuse of discretion, it was necessary for the court to consider evidence as to all of the facts and circum-

---

[2] Cf. *State Board of Health v. Godfrey,* 223 Va. 423, 290 S.E.2d 875 (1982), decided today, which was governed by the Administrative Process Act (Code §9-6.14:1, *et seq.*), unlike the case at bar.

stances upon which they were based. There was no error in the court's decision to admit this evidence.

The Board assigns error to the trial court's findings that its orders directing the utilities to connect to HRSD were arbitrary, capricious, and unreasonable. As noted above, the Board concedes that it was not acting under Code §62.1-44.19:1, which purports to authorize such mandates where the Board determines that a discharger is polluting a stream in Virginia Beach. Rather, says the Board, it was engaged in the application of standards.

A standard is defined: "3 a: something that is established by authority, custom, or general consent as a model or example to be followed . . . 4: something set up and established by authority as a rule for the measurement of quantity, weight, extent, value or quality." Webster's Third International Dictionary 2223 (3d ed. 1971). The State Water Control Law provides in §62.1-44.3: "*Standards* means standards established under §62.1-44.15(3)." The latter section authorizes the Board "to establish such standards of quality and policies for any State waters consistent with the general policy set forth in this chapter . . ." In 1975 that section was amended to add: "Whenever the Board considers the adoption, modification, amendment or cancellation of any standard, it shall give due consideration to, among other factors, the economic and social costs and benefits which can reasonably be expected to obtain as a consequence of the standards as adopted, modified, amended or cancelled."

When the Board adopted "j" and "k" in 1967 it acted under former Code §62-23, which defined its power and duties. That section, after authorizing the adoption of standards in subsection (3), provided for enforcement in subsection (8): "To issue a special order or orders directing any particular owner or owners to secure within the time specified therein, such operating results as are reasonable and practicable of attainment toward the control, abatement and prevention of pollution of the State waters." The Board itself, in a 1967 publication entitled: "Criteria and Procedures for Establishing Standards of Water Quality for Virginia State Waters," defined "standard" as ". . . a numerical value or a word description of stream quality . . . based on criteria . . . and, as set forth above, a balancing of the equities in each particular case, that is, on the basis of what the law says is 'reasonable and practicable of attainment.' "

We conclude that the legislative intent governing the Board's authority to establish and enforce standards was at all times to require that rules be promulgated which are reasonable, practicable of attainment, based upon a fair weighing of the economic and social costs and benefits involved, and of uniform application to all affected parties similarly situated. The Board argues that nothing in §62.1-44.15(3) requires the Board to adopt water quality standards that are "technologically or economically feasible at the time of adoption." We think that the Board was at all times under a duty to act reasonably. *See FMC Corp.* v. *Train,* 539 F.2d 973, 981-85 (4th Cir. 1976). The Board adopted a "Special Standard" (significantly captioned "Objective for Nutrients") which it knew to be unattainable at any cost, treated it as a desirable goal but made no effort to enforce it for over nine years, then without notice or hearing directed the utilities to cease their treatment activities because of their inability to comply with it. The Board contends that its orders are practicable of attainment because, having failed to meet the applicable standard, the utilities are left with the alternative of connecting to HRSD. Shorn of the alternative of complying with a valid standard, these orders are mere unilaterial edicts, the quintessence of arbitrary governmental action. Our institutions are based upon the rule of law, not government by fiat. We shall affirm the decrees of the circuit court on these grounds.

Finally, the Board assigns error to the trial court's award of costs to the appellee utilities, citing Code §14.1-201 which provides:

> In no case, civil or criminal, except when otherwise specially provided, shall there be a judgment for costs against the Commonwealth.

This section is part of Chapter 3 of Title 14.1 of the Code. That Chapter begins with §14.1-177, which provides:

> The laws of costs shall not be interpreted as penal laws; nor shall anything *in this chapter* take away or abridge the discretion of a court of equity over the subject of costs, except as provided in §14.1-181. [Emphasis added.][3]

---

[3] The exception of §14.1-181 relates only to costs in the Supreme Court, which are to be recovered by the party substantially prevailing. Since §14.1-181 is an exception to the oper-

Since Code §14.1-201 is "in this chapter," it is subject to the discretion of the chancellor in apportioning costs in an equity case in a circuit court.

Were these equity cases? The judicial review procedure of Code §62.1-44.29, followed here, begins with the filing of a notice of appeal with the Board, rather than with the clerk of the court. Within thirty days thereafter, the Board transmits its record to the clerk. There is no requirement for additional pleadings. The court, sitting without a jury, hears the appeal on the record and such other evidence as the ends of justice require. The court affirms, remands, reverses or, as was done here, modifies the Board's decision so as to accomplish justice in the circumstances of the particular case. The statute gives no guidance to the clerk as to whether the case should be filed on the law or the equity side. In the cases at bar, the first pleadings filed were motions to dismiss filed by the Board. The clerk assigned law numbers to them and the cases were thereafter carried in law files. At the end, however, the court entered a "Final Decree" in each case which essentially granted equitable relief to the utilities.

▉ The form and object of a judicial proceeding, and particularly the nature of the relief which it makes available, determine whether it is legal or equitable. The label assigned by the clerk is not controlling. Applying these criteria we find the cases at bar to be of an equitable nature. It follows that the apportionment of costs was within the trial court's discretion, which will not be reversed except upon a clear showing of abuse. *Goodloe* v. *Woods,* 115 Va. 540, 80 S.E. 108 (1913).

For these reasons, the decrees of the trial court will be

*Affirmed.*

---

ation of §14.1-177, it became necessary in *Roller* v. *State Milk Comm.,* 204 Va. 536, 132 S.E.2d 427 (1963), to determine whether the Milk Commission was "the Commonwealth" for the purposes of §14.1-201 (formerly §14-197). *Roller* dealt with costs in the Supreme Court while this case deals with costs in the trial court. Accordingly §14.1-181 has no application here and we need not make a determination whether the Board is "the Commonwealth" for this purpose.