# CIRCUIT COURT OF ACCOMACK COUNTY

Captain's Cove
Utility Co., Inc.

v.

State Water
Control Board

October 11, 2007

Case No. 06CL452

BY JUDGE GLEN A. TYLER

In this appeal of a case decision of the State Water Control Board, the Court will decide whether the Board interpreted or applied pertinent sewage discharge permit regulations according to law.

Captain's Cove is a large residential subdivision in the northeastern corner of Accomack County. Captain's Cove Utility Company, Inc., operates a sewage treatment plant and seeks a permit to discharge treated effluent near the mouth of Swan's Gut, a small tributary of the large Chincoteague Bay. They do so in order to avoid land or groundwater application of sewage such as by septic tanks and drainfields or lagoons.

The Utility Company applied for a Virginia Pollutant Discharge Elimination System Permit from the Board, pursuant to Va. Code Ann. § 62.1-44.18, et seq. (2006 Repl. Vol.). The Board has denied the permit, and the Utility Company appeals on the administrative record, pursuant to the Virginia Administrative Process Act.

The record is quite large, consisting of well over 3,000 pages. The Court need not review in this Opinion all of the record, as the issue is quite narrow and principally one of law.

The Board first denied the permit at a meeting on September 6, 2006. The Board's denial was communicated to the Utility Company by letter of September 25, 2006, from the Regional Director of the Virginia Department

of Environmental Quality. The Regional Director made reference to requirements in two regulations as a basis for the denial. However, he actually attached to the letter and highlighted three regulations: 9 VAC 25-260-10, -20, and -270.

The Utility Company filed a timely appeal to this Court on November 27, 2006, and therein cited its timely request of the Board for a formal hearing. Thereafter, an agreed order was entered by the Court continuing the case and providing for a formal hearing.

The formal hearing was conducted on May 4, 2007. In its opening statement, by counsel, the Virginia Department of Environmental Quality stated "the discharge will indeed result in a violation of water quality standards by interfering with the designated uses of the waters." The designated use in this case is harvesting hard clams (*mercernaria mercernaria*).

The hearing officer concluded on June 29, 2007, that "the proposed project will result in shellfish bed condemnation and that the condemnation will violate the general water quality standard set forth in 9 VAC 25-260-10. . . ." That section is entitled "Designation of Uses." The hearing officer concluded that the denial of the permit by the Board should be upheld.

The State Water Control Board met on July 30, 2007, to render a final decision on the application of the Utility Company for a discharge permit. In argument and answers to questions from the Board about 9 VAC 25-260-20, entitled "General Criteria," counsel for the Department, which recommended against the permit, stated "I was referring to the outfall, the discharge from the sewage treatment plant as *the substance*." (Emphasis added.) Counsel further answered "The discharge results in condemnation. Condemnation interferes with designated use in the sense that people are not going to recreationally clam." The Board denied the permit stating that the denial was pursuant to 9 VAC 25-260-270, based upon a condemnation area required by the State Health Department, and pursuant to a violation of standards under 9 VAC 25-260-10 and -20, its chairman stating "the State Health Department's determination binds our hands. . . ."

The appeal in this Court, that had been continued, was heard on August 30, 2007. The Assistant Attorney General of Virginia argued for the Department and the Board that there does not have to be an actual violation of the standards, that, if the plant were discharging "Perrier," the Division of Shellfish Sanitation of the Department of Health would require a condemnation area as a buffer zone, and that in itself would violate the general standard because that would impair a designated use, clamming. Obviously, the Attorney General, the Department of Environmental Quality

and the Board all believe that the effluent from the plant is itself the "substances" referred to in 9 VAC 25-260-20, as the Board stated in its finding of fact number five.

Only portions of the Board's findings of fact are pertinent to this appeal. There is no dispute that the sewage treatment plant, the proposed outfall, and the effluent all meet or exceed every standard and requirement of the Department of Environmental Quality and the State Water Control Board. But for the presence of clams and the Health Department's condemnation area, the plant would be avoiding the use of septic tanks in the subdivision by now.

Swan's Gut is tidal and ebbs and flows to Chincoteague Bay. The ocean ebbs and flows through Chincoteague Inlet a couple of miles from Swan's Gut so that the current or tidal exchange that far away is not very substantial. Effluent discharged into Swan's Gut and then into Chincoteague Bay would not be diluted to a sufficient extent, such that the Virginia Department of Health, Division of Shellfish Sanitation, requires for this project a 142-acre buffer zone or condemnation area in Chincoteague Bay at the mouth of Swan's Gut. (See Exhibit No. 21.)

There are clams growing in the 142-acre area. While the quantities of clams in that area are not large and the water is generally too shallow for commercial harvesting to be as economically efficient as one might prefer, the area can be used for recreational clamming, and commercial clamming is possible. There is no evidence that the 142-acre area has been used to any appreciable degree in the past for commercial harvests. There are no shellfish leases of the rather hard subaqueous substrate in the 142-acre area, nor have there been any.[1] However, whether clams could be harvested there efficiently is not material to this decision. It is sufficient to recognize that there are clams present and they may be harvested. The balancing of social and economic impacts will be discussed below.

In such circumstances as exist in this case, upon issuance of a permit, the Department of Health would automatically establish a restricted area, sometimes referred to as a condemnation area, in the receiving waters of the sewage plant outfall. This is done in case of an unintended discharge such as may be caused by a hurricane or an accident. It is a precautionary measure

---

[1] At the formal hearing the hearing officer paid deference to the one *pro se* party who appeared, testifying that he would like to lease a plot of subaqueous bottom there to plant cultured clams, but he was a neophyte in the selection of viable areas for the grow out of seed clams, not a seasoned waterman.

relative to public health. The taking of shellfish is not prohibited in the condemnation area, it is restricted. Any shellfish taken must be depurated by relaying out of the 142-acre area to another area, as for instance to leased or public bottom in another part of Chincoteague Bay. The impracticality of depuration by relaying is a consideration, especially regarding recreational clamming. It should be noted though that the area would not be restricted because of any existing unacceptable condition of the water or of the clams while treated effluent is being discharged according to a permit. The waters would be restricted due solely to a discharge outfall and not due to water quality. The designated use would be administratively removed, in effect, through the issuance of a discharge permit. There never would be any restricted areas on account of outfalls from plants if there never were any discharge permits granted for outfalls into shellfish waters.

Before proceeding to the heart of the matter, the Court will discuss the issue of the socio-economic effect of the proposal. The applicant, Utility Company, complains that the Board failed to give this subject due consideration as required by 9 VAC 25-260-270. However, the Board found that it did appropriately consider such effect or balancing of interests. The competing interests are the rather modest clam resource on the one hand and a solution to insidious pollution by groundwater discharge through individual septic tanks in the subdivision on the other hand.[2] The Board gave the subject of socio-economic effect short shrift, but it was not the dispositive issue. The Board did not conclude that future shellfish harvest in the 142 acres outweighed other considerations. They simply found that they gave the matter due legal consideration. They denied the permit on other grounds.

We come to the heart of the matter. The proposed condemnation of 142 acres of shellfish waters is based on hypothetical values and circumstances. The Board found there would be no actual violations of water quality standards. The question becomes whether the Board's hands were bound or whether they arbitrarily interpreted the statutes and regulations in such a way as to deny the permit. In the final analysis, what criteria did or would the

---

[2] The problem with septic tanks is magnified on the Eastern Shore in its low-lying, alluvial soil adjacent to the ocean and the Chesapeake Bay. "The need for municipal sewage treatment in Accomack County is highlighted by evidence of groundwater pollution from failing septic systems . . . and by 26 areas along the shoreline of the bayside and seaside that are closed to shellfish harvest because of contamination. . . ." reported the front page of *The Eastern Shore News* on October 6, 2007.

Board use to evaluate any application for a permit to discharge into shellfish waters, or would they deny all such applications, creating an impossible-to-attain standard?

The Commonwealth's water policy is to protect water quality, restore water quality, safeguard waters from pollution, prevent increase in pollution, and reduce existing pollution – all regarding the water itself. Va. Code Ann. § 62.1-44.19(B) (2006 Repl. Vol.).

Regarding applications for approval of discharges from sewage treatment works to state waters, the Legislature has provided that:

> The Board shall approve such application if it determines that minimum treatment requirements will be met and that the discharge will not result in violations of *water quality* standards. If the Board disapproves the application, it shall state what modification or changes, if any, will be required for approval.

Va. Code Ann. § 62.1-44.19(B) (2006 Repl. Vol.) (emphasis added).

The statute emphasizes the quality of the water and implies that proper discharges are a goal of the policy. In referring to standards,[3] the statute means standards of quality and policies consistent with the general policy. Va. Code Ann. § 62.1-44.15(3a) (2006 Repl. Vol.).

Pursuant to the last cited statute, the Board adopted regulations. 9 VAC 25-260. Among the regulations is a definition for "criteria":

> Criteria means elements of the Board's water quality standards, expressed as constituent concentrations, levels or narrative statements, representing a *quality of water* that supports a particular use. When criteria are met, water quality will generally protect the designated use.

9 VAC 25 260-5 (emphasis added). The term "criteria," therefore, is not equivalent to the term "designated use." They have different meanings. The regulations deal specifically with shellfish buffer zones.

> When the Board finds that the proposed project will result in shellfish bed condemnation and if the condemnation will violate the general standard, it shall disapprove the proposal.

---

[3] See Va. Code Ann. § 62.1-44.3 – Definitions.

9 VAC 25-260-270. As we have seen, permit approval will result in shellfish bed condemnation by the Department of Health. But it is not just the condemnation that results in disapproval by the Board. Disapproval on that sole basis would violate the rule of *Commonwealth v. County Utilities*, 223 Va. 534 (1982), which provides that regulations must be "reasonable, practicable of attainment, based upon a fair weighing of the economic and social costs and benefits involved, and of uniform application to all affected parties similarly situated."

The Board concludes that the "general standard" is equivalent to "designated uses." Regulation 9 VAC 25-260-10 provides for designated uses as follows:

> All State waters . . . are designated for the following uses . . . the production of edible and marketable natural resources, e.g. fish and shellfish.

Their conclusion is a *non sequitur*. The general standard is actually set out in another regulation entitled "General Criteria."

> State waters shall be free from substances attributable to sewage . . . in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such waters. . . .

9 VAC 25-260-20. We see that the condemnation must be combined with a second element, the violation of the general standard (criteria), which means that there must be a finding that there are concentrations or amounts or combinations of *substances* which interfere with designated uses. The effluent itself is not "substances" in the effluent. Furthermore, if the regulation in 9 VAC 25-260–270 can be interpreted as the Board interprets it, that the effluent itself, regardless of how clean, is such a substance, then that interpretation would be, as applied, a violation of the rule in *County Utilities*. The interpretation would be as though the regulation in 9 VAC 25-260–270 read:

> When the Board finds that the proposed project will result in shellfish bed condemnation (an interference with designated uses) and if the condemnation will violate the general standard (an interference with designated uses), it shall disapprove the project.

More importantly, how could the Board's interpretation, as applied, then comply with the statute, which is the legislative intent, requiring that, if the discharge will not result in violations of water quality standards, it shall approve the application? And if they nevertheless disapprove, how could they state what modifications or changes will be required for approval? Va. Code Ann § 62.1-44.19(B) (2006 Repl. Vol.).

The Board has concluded that if there is an application for a permit to discharge into State waters and if the waters contain even recreational quantities of shellfish and if the Department of Health will require a restricted area, then the application must be disapproved. The Department of Environmental Quality and the Board could have come to that conclusion soon after the Utility Company filed its application in 2005 and spared them all of their engineering expense, if that were the law.

Finally, if 9 VAC 25-260-270 must be interpreted as the Board does, then the regulation would also violate the legislative intent *per se* as explained in *County Utilities*.

Captain's Cove Utility Company, Inc., has complied with all legal requirements for a permit to discharge effluent into State waters, and the State Water Control Board will be ordered to issue an appropriate permit, according to law.